In re The DEPARTMENT OF ENERGY
STRIPPER WELL EXEMPTION
LITIGATION.

ENERGY RESERVES GROUP, INC., Suburban Propane Gas Corporation, Marathon Oil Company and Sklar & Phillips Oil Company

v.

DEPARTMENT OF ENERGY, et al.

SIERRA PETROLEUM CO., INC.

v.

DEPARTMENT OF ENERGY, et al.

BRADEN–ZENITH, INC. and The Estate of S. H. Killingsworth

v.

DEPARTMENT OF ENERGY, et al.

MOBIL OIL CORPORATION, Mobil Producing Texas & New Mexico, Ind. and Willie Ansley Bryson

v.

DEPARTMENT OF ENERGY, et al.

STELBAR OIL CORPORATION, INC., The Standard Oil Company, Ohio and Theo M. Glenn, Jr. and Eleanor Glenn

v.

DEPARTMENT OF ENERGY, et al.

Robert Dale BRANDENBURG and Texaco, Inc.

v.

DEPARTMENT OF ENERGY, et al.

AMIN OIL, INC.

v.

DEPARTMENT OF ENERGY, et al.

Otis C. PEAVEY, et al. and Sun Oil Company (Delaware)

v.

DEPARTMENT OF ENERGY, et al.

Howard STOUT, Lorena Houlton and Mary E. Hall, Co-Trustees of the

Charles S. Page Trust and Gulf Oil Corporation

v.

DEPARTMENT OF ENERGY, et al.

Robert E. DAVIS and Energy Consumers & Producers Association, Inc., Ruthven, Inc., Pioneer Operations Company, Inc.

v.

DEPARTMENT OF ENERGY, et al.

George R. JONES, et al.

v.

DEPARTMENT OF ENERGY, et al.

PETROLEUM MANAGEMENT, INC.

v.

DEPARTMENT OF ENERGY, et al.

ATLANTIC RICHFIELD COMPANY

v.

DEPARTMENT OF ENERGY, et al.

W. R. MURFIN, d/b/a Murfin Drilling Company, and Champlin Petroleum Company

v.

DEPARTMENT OF ENERGY, et al.

UNION OIL COMPANY OF CALIFORNIA

v.

DEPARTMENT OF ENERGY, et al.

COASTAL STATES GAS CORP., Coastal States Gas Producing Co., and Gas Producing Enterprises Inc.

v.

DEPARTMENT OF ENERGY, et al.

EXXON CORPORATION

v.

DEPARTMENT OF ENERGY, et al.

CONTINENTAL OIL CO.

v.

DEPARTMENT OF ENERGY, et al.

HUNT OIL COMPANY

v.

DEPARTMENT OF ENERGY, et al.

CRYSTAL OIL COMPANY and
Ira Thomas May

v.

DEPARTMENT OF ENERGY, et al.

MUSKEGON DEVELOPMENT CO.

v.

DEPARTMENT OF ENERGY, et al.

OKLAHOMA ASS'N. OF ENERGY
CONSUMERS & PRODUCERS

v.

DEPARTMENT OF ENERGY, et al.

Paul B. FLETCHER, Sr. and Anadarko
Production Company

v.

DEPARTMENT OF ENERGY, et al.

IU INTERNATIONAL OIL & GAS, INC.

v.

DEPARTMENT OF ENERGY, et al.

WOOD OIL CO. and Dan Wallace d/b/a
Columbus Oil Co.

v.

DEPARTMENT OF ENERGY, et al.

WILL I. LEWIS ENTERPRISES, INC.

v.

DEPARTMENT OF ENERGY, et al.

Jimmie AUSTIN d/b/a Austin
Drilling Company

v.

DEPARTMENT OF ENERGY, et al.

SANTA FE ENERGY COMPANY

v.

DEPARTMENT OF ENERGY, et al.

George G. ANDERMAN and Donald
R. Kirby

v.

DEPARTMENT OF ENERGY, et al.

Patricia Anne LEONARD, et al.

v.

DEPARTMENT OF ENERGY, et al.

FARMERS PETROLEUM
COOPERATIVE, INC.

v.

DEPARTMENT OF ENERGY, et al.

KIRKWOOD OIL & GAS COMPANY

v.

DEPARTMENT OF ENERGY, et al.

PETROLEUM CORPORATION
OF TEXAS

v.

DEPARTMENT OF ENERGY, et al.

Civ. A. Nos. 77–1146, 77–1087, 76–429–C6,
78–1070, 78–1176, 78–1230, 79–1387, 78–
1410, 78–1513, 77–1456, 78–1235, 78–1509,
79–1204, 79–1258, 79–1318, 79–1319, 79–
1320, 79–1321, 79–1322, 79–1325, 79–1384,
79–1385, 79–1386, 79–1388, 79–1389 and
79–1416.

MDL No. 378.

United States District Court,
D. Kansas.

July 14, 1981.

John P. McKenna, Nancy C. Crisman, Frank W. Krogh, Samuel Soopper, Marcia K. Sowles, John L. Gurney, U. S. Dept. of Energy, Washington, D. C., for defendants.

Joseph W. Kennedy, Dennis M. Feeney, John P. Bowman, Morris, Laing, Evans, Brock & Kennedy, Chartered, Wichita, Kan., for Energy Reserves Group, Inc.; Suburban Propane Gas Corp.; Sun Oil Company; The Gulf Companies; Anadarko Production Co.; Texaco Inc.; Champlin Petroleum Company; Marathon Oil Company; Standard Oil Company, Ohio; Killingsworth Estate; George B. Anderman and Donald R. Kirby; Stelbar Oil Corporation, Inc.; Sierra Petroleum Co.; Braden-Zenith, Inc.; Sklar & Phillips; Will I. Lewis Enterprises, Inc.

Daniel Joseph, Warren E. Connelly, Akin, Gump, Strauss, Hauer & Feld, Washington, D. C., for Anadarko Production Co.; Marathon Oil Company; Standard Oil Company, Ohio; Sun Oil Company.

Richard Jones, Evan J. Olson, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for Muskegon Development Co.; Mobil Oil Corporation; Mobil Producing Texas New Mexico Inc.

Stewart Stone, Jr., John E. Sparks, Brobeck, Phleger & Harrison, San Francisco, Cal., for Union Oil Company of California.

Keith A. Jones, Fulbright & Jaworski, Washington, D. C., for Coastal States Gas Corporation.

Irley A. Bonnette, Houston, Tex., for Anadarko Production Co.

Arthur M. Meyer, Jr., John R. Cope, Bracewell & Patterson, Washington, D. C., for Killingsworth Estate.

David J. Beck, Ronald D. Secrest, Fulbright & Jaworski, Edward de la Garza, Houston, Tex., for Exxon Corporation; Crystal Oil Co.

A. B. Conant, Jr., Karen S. Bedell, Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., for Hunt Oil Company; Patricia Anne Leonard.

John L. Carter, Vinson & Elkins, Houston, Tex., Michael J. Henke, Richard G. Wilkins, Vinson & Elkins, Washington, D. C., for Conoco, Inc.; Aminoil USA, Inc.

Richard L. Bohanon, Andrews, Davis, Legg, Bixler, Milsten & Murrah, Oklahoma City, Okl., for Oklahoma Association of Energy Consumers and Producers.

Gerald Sawatzky, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Atlantic Richfield Company.

Gus Svolos, Richard E. Weicher, Ronald A. Lane, Chicago, Ill., for Santa Fe Energy Company.

Clark R. Mandigo, Wichita, Kan., for Energy Reserves Group, Inc.

R. Kennedy Bridwell, Morristown, N. J., for Suburban Propane Gas Corp.

George G. Olsen, Stephen G. Greenberg, Williams & Jensen, P. C., Washington, D. C., for IU International Oil & Gas, Inc.

Fred A. Gipson, Gipson & Johnston, Seminole, Okl., for Wood Oil Co., et al.; Jimmie Austin.

Herbert H. Hopper, Wichita, Kan., for Petroleum Management, Inc.

James P. Murphy, Findlay, Ohio, for Marathon Oil Company.

D. Frank Frisina, Cleveland, Ohio, for The Standard Oil Company, Ohio.

John C. Cirone, Kerry R. Brittain, Fort Worth, Tex., for Champlin Petroleum Company.

J. Frederick Lawson, Tulsa, Okl., for Texaco Inc.

Jonathan C. Waller, Elaine Boze, G. David Neal, Dallas, Tex., for Sun Oil Company (Delaware).

Robert F. Ochs, Edward T. Cotham, Jr., Houston, Tex., for The Gulf Companies.

James D. Voorhees, Davis, Graham & Stubbs, Denver, Colo., for George G. Anderman and Donald R. Kirby.

James B. Harris, Thompson & Knight, John McReynolds, Worsham, Forsythe & Sampels, Dallas, Tex., for Petroleum Corporation of Texas.

John M. Shuey, Shuey, Smith & Fleming, Shreveport, La., for Sklar & Phillips.

Evan J. Olson, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for Farmers Petroleum Cooperative, Inc.

Philip E. Pankoff, Wood, Ris & Hames, Denver, Colo., for Kirkwood Oil & Gas Company.

## OPINION OF THE COURT

THEIS, Chief Judge.

These multidistrict litigation (MDL) cases now come on for final decision of the Court. Trial of these cases, after extensive pretrial proceedings and litigation involving two appeals by the defendants to the Temporary Emergency Court of Appeals (TECA), was finally held to this Court from January 19, to February 6, 1981. After considering the evidence presented at trial, and after studying the briefs of the parties, and reviewing the appellate decisions in the consolidated cases, the Court enters this opinion.

A brief review of the pretrial proceedings may be illuminating and certainly, in this Court's opinion, accounts for the singularly bellicose and adamant efforts of the Government, through their various counsel, to resist trial on the merits of the issue of law common to all of these cases. Originating as a single case to enjoin as illegal the governmental enforcement of the regulations of the then Federal Energy Adminis-

tration (FEA), now Department of Energy (DOE), prohibiting those plaintiff oil companies from including fluid injection wells in a well count to establish pricing levels for crude oil produced from stripper wells on plaintiffs' leases, under a stripper well exemption in the legislative act, other cases were soon filed which were consolidated into one action. These cases were ruled on by this Court in its decision reported in *Energy Reserves Group, Inc. v. Federal Energy Administration*, 447 F.Supp. 1135 (D.Kan.1978), which held FEA Ruling 1974–29, excluding the count of injection wells, was legislative in nature rather than interpretive of the regulation, and therefore void. This decision was appealed to the Temporary Emergency Court of Appeals, resulting in a reversal of the Court's decision in a 2 to 1 decision of the three learned judges of TECA, in which each judge rendered a separate opinion. This decision is reported as *Energy Reserves Group, Inc. v. Department of Energy*, 589 F.2d 1082 (TECA 1978). In short summary, the TECA majority held valid Ruling 1974–29 as a reasonable interpretation of the regulation implementing the statutory stripper well exemption, and remanded for trial the issue of whether the regulation was valid under the intent of Congress as expressed in the statute and its legislative history, and whether the regulation was arbitrarily and capriciously adopted by the administrative agency. By this time case litigation was burgeoning on the identical issues in many other federal court districts and forwarded to this district and combined for disposition of this Court as multidistrict litigation under order of the Judicial Panel of Multidistrict Litigation in June, 1979, reported as *In re Dept. of Energy Stripper Well Exemption Litigation*, 472 F.Supp. 1282 (1979). Governmental resistance to this Court's efforts to get the case ready for trial and its unilateral insistence that the litigation had been terminated by TECA in the 1978 appeal, resulted in yet another appeal to mandamus this Court, reported as *Duncan, Sec'y. of Energy v. Theis, Chief Judge*, 613 F.2d 305 (Em.App.1979). TECA rejected the government counsels' contention that

TECA had decided this case in its prior opinion, and that there was no subject matter for litigation and decision. After continued resistance by the government at every stage of the pretrial discovery proceedings, trial finally began on January 19, 1981.

The government's theory of absolutism in the rightness of its conduct, its refusal to recognize the adversarial aspect of our legal system, and general truculence, are aptly illustrated by an early assertion in its Post-Trial Brief, wherein it is stated: "Although the trial held in this matter was extremely improper and unnecessary . . ."

Generally, the whole history of this litigation has been the government's premise that its administrative decisions are judicially unreviewable, and the minds and actions of the administrative decision-makers may not be probed to determine the basis for such action. This position has been vigorously and adversarily disputed by an array of competent counsel from some of the leading law firms around this nation. As a result of an earlier injunction order in this case there has been accumulated in trust under court supervision a fund approximating one billion dollars, which awaits judicial distribution upon the termination of this litigation.

The issues now before the Court in the trial and for decision are: (1) whether the regulation itself, interpreted by TECA as excluding injection wells from the well count, was reasonable and valid within congressional intent of the statutory exemption; and (2) whether the promulgation of the regulation (C.F.R. 154(s)), was arbitrary and capricious. Since the inception of this litigation these two issues have always been the principal underlying legal points for ultimate decision.

To better understand the parameters of this dispute the Court considered engineering facts underlying crude oil production generally and secondary recovery in particular, various state procedures governing secondary recovery, and the treatment of injection wells in secondary recovery projects under certain federal programs.

The Court's conclusions with respect to these matters constitute the first portion of this opinion.

The Court then sets out the controlling statutes, regulations and ruling. This section is followed by the holding of this Court that Congress intended injection wells to be included in the well count, and a lengthy explanation as to how the Court reached this conclusion and why the DOE's contrary position is not binding on the Court.

The Court then concludes that even if the statute did not mandate including injection wells, the manner in which the Department excluded the wells from the well count was arbitrary and capricious.

For those reasons, the Court has found that the stripper well exemption regulation, as interpreted by Ruling 1974–29, is invalid and must be struck down. The Court, in this opinion, has also ruled on certain post-trial motions, and these rulings are contained in part V of this opinion and order.

## I. FACTUAL AND REGULATORY BACKGROUND

The organic theory of the origin of oil is accepted by 99.9% of engineers. (Whiting, T. 132033.) [1] This theory holds that oil came from organisms that lived in and adjacent to inland seas during geologic times. Plant and animal residues were deposited in these inland seas and over time were covered with sediment and subjected to great heat and pressure. (Whiting, T. 139.) This heat and pressure "destructively distilled" those organisms and generated petroleum. (Id.) This petroleum then is believed to have migrated from the place it originated, the source beds, through very small pores in the underground rock until it was caught in some kind of geologic "trap" which prevented further migration. Three of these geological traps are illustrated in P.X. 1–14 through P.X. 1–17. Oil caught in such a trap constitutes an oil reservoir.

The rock formations which contain this oil must possess two characteristics to allow the oil to move within the reservoir. The rock must have "porosity" and "permeability." Porosity is an indication of the storage capacity of a rock. (Whiting, T. 140.) Porosity must be present to have an accumulation of oil. (Whiting, T. 141.) Porosity is the measure of the microscopic pore spaces between the grains of sand in the rock formation. An artist's conception of this characteristic is shown on P.X. 1–9. Permeability occurs where microscopic pore spaces are interconnected in a manner such that oil can move through the rock. The rock must have permeability in order to transmit oil. Samples of the type rock which contain the oil in the underground reservoirs are shown in P.X. 170–171.

The production of oil is the process of forcing the oil from the rocks in which it is found into a well bore for transportation to the surface. Primary recovery is an oil recovery process which utilizes the natural energies in a reservoir to displace the oil from the reservoir into the well bore of an output well. (Whiting, T. 154.) The three major forms of natural energy within an oil reservoir are the "gas cap drive," the "natural water drive," and the "solution gas drive." These three naturally occurring drive forces are illustrated in P.X. 1–20, 1–22 and 1–21.

"Gas cap drive" occurs where a quantity of undissolved gas exists within a reservoir. When a recovery well is completed in the formation, the pressure from the free gas forces the oil into the well bore through which it is transported to the surface. As the recovery continues, the gas cap expands to displace oil in the rock pores and force the oil into the recovery well bore. (Whiting, T. 160.)

A natural water drive reservoir occurs where there is a water reservoir underlying the oil reservoir. In this situation, as oil is withdrawn from the reservoir, the water

1. The Court will refer to citations to the trial transcript by citing the witness and the page in the transcript, e. g., (Whiting, T. 132–33.) Depositions will be cited similarly, only "D." will be used to denote deposition testimony. Plaintiffs' exhibits are cited "P.X." and the number. Defendants' (Government's) exhibits are cited "G.X." and the letter.

underlying that oil forces itself up, displacing oil as it expands into the oil bearing formation, forcing the oil into the recovery well bore.

Solution gas, or dissolved gas drive, is the third primary drive mechanism. Because of the high pressures naturally occurring within an oil reservoir, natural gas is forced into solution in the oil. When a recovery well is completed the reservoir pressure is reduced, and the dissolved gas begins to come out of solution. The process is the same as when a bottle of a carbonated beverage is opened. When the cap is taken off, some of the dissolved carbon dioxide within the beverage comes out of the liquid. When the gas in the reservoir comes out of solution, it expands and forces oil out of the pore spaces in the rock and into the well bore. (Whiting, T. 155–56.) The point at which dissolved gas begins to come out of solution is referred to as the "bubble point."

There is a limit to the amount of oil that can be recovered utilizing the naturally occurring reservoir energy. A natural gas cap or natural water drive allows for the recovery of 20 to 50 percent of the oil contained in the reservoir. (Whiting, T. 169, 170.) A solution gas drive mechanism allows for the recovery of 15 to 25 percent of the oil contained in the reservoir. (Whiting, T. 169; O'Neal, T. 268.)[2]

Secondary recovery is a recovery process in which the naturally occurring reservoir energy is augmented by additional energy in the form of matter injected into the producing formation. (Whiting, T. 163.) A water injection system increases the production of oil in two ways. First, the injection helps to maintain the pressure within the reservoir. The injection process provides the power to move oil through the reservoir to the recovery well. Second, water injected into an oil reservoir physically displaces the oil and moves it toward the recovery well. Water injection has been recognized for about fifty years as an ac-

cepted efficient method of augmenting oil recovery. (Whiting, T. 164.)

A water injection recovery system requires at a minimum two oil wells. One well is the injection well and is used as a vehicle to inject water into the oil formation. The other well is the recovery well and is used as the conduit to remove the oil forced into the well bore. Typically, an injection well is a former recovery well which has been converted to injection. Physically, there is little difference between the structure of an injection well and the structure of a recovery well. Plaintiffs' Ex. 35, which is attached to this opinion as Appendix "A," shows the similarity of physical structure between a typical injection well and a typical recovery well.

From an engineering standpoint, there is an appropriate time at which to initiate waterflooding so as to maximize recovery from a reservoir. (Whiting, T. 172.) The optimum time, however, the "bubble point," is that time at which the dissolved gas in the oil starts to come out of solution. Delay in initiating injection past the "bubble point" decreases ultimate recovery, since the mobility of the oil decreases. (Whiting, T.177.) Recovery lost because of slow initiation of secondary recovery can never be recaptured by use of primary recovery or waterflooding. Delays past the optimum point in initiating waterflooding cause an absolute decrease in recoverable oil reserves. The early initiation of injection also results in less recovery than in a properly waterflooded field, since the natural displacement power of the dissolved gas is wasted. (Whiting, T.173, 175.)

The increased recovery resulting from water injection is shown on P.X. 1037 to P.X. 1–40. The increased recovery is normally expected to be from 67 to 150 percent of the amount of oil recovered using primary methods. (O'Neal, T.268, 311.)

2. Drive mechanisms should not be confused with lift mechanisms. Lift mechanisms are the devices utilized to transport the oil from the bottom of the well bore to the surface. Drive mechanisms are the means of forcing the oil through the rock into the well bores. Various means of lifting the oil are available, the specifics of the devices are not important to the resolution of this case.

Institution of a secondary recovery project using waterflooding is a complex and expensive undertaking. Before initiating waterflooding, a producer must determine whether an oil-bearing formation is suitable for secondary recovery. Dissolved gas drive reservoirs seem to be the best candidates for secondary recovery, since the natural energy is more quickly dissipated, leaving more oil in place. (Platt, T.698–99; Whiting, T.170.) The engineers and geologists must make laboratory studies to determine if additional oil could be recovered by injection of fluid into the reservoir. (Platt, T.700.)

If it is found that water injection would be beneficial, then the entire oil field must be "unitized." Different portions of an oil field may be leased by different companies. Efficient waterflooding requires that the entire reservoir be under a single plan. Unitization is the process through which the various leaseholders are brought into one entity for the exploitation of the field. (O'Neal, T.246–47; Platt, T.703.)

A producer must obtain a source of water to inject into the reservoir. Fresh water might be obtained from a river, as was done in the Salem Unit (Eley, T.400), or from wells, as was done in the Northwest Cha Cha Unit (Shearin, T.544). Salt water might be obtained from a variety of sources (Platt, T.701). While the costs of obtaining the water vary, they may be high. The water from the water supply must be chemically treated and filtered to be suitable for injection. (See P.X. 28.) Injection of water which is not compatible with water already present in a reservoir could cause a plugging of the pore space in the oil-bearing rocks, which in turn could prohibit continued injection, or otherwise be detrimental to the recovery process. (Platt, T.708; Burt, T.1035–36.) The water is injected at high pressures which could vary between 1000 p.s.i. and 6000 p.s.i. (Platt, T.709.) These injection pressures require large injection pumps. (McConnell, D.18.) (See, P.X. 41, P.X. 29–2.)

Wells to inject the water must either be drilled, or recovery wells must be converted to injection wells. Costs of drilling an injection well are comparable to the costs of drilling a recovery well. (McConnell, D.17.) The conversion of wells from recovery wells to injection involves first performing remedial work on the recovery well. (Platt, T.710; P.X. 35.) Next, tubing is placed in the well casing and a packer is placed around the bottom of the tubing. (Platt, T.711.) A well head sufficient to withstand the high pressures is installed on the top of the well. (Id.)

Various patterns of the placement of injection wells can be used in a secondary recovery project. The pattern which is selected depends upon the geologic characteristics of the reservoir, such as the permeability of the rock, the reservoir pressure and the oil characteristics. (O'Neal, T.269.) Recognized patterns include the peripheral flood pattern (O'Neal, T.270; P.X. 7), the five spot flood pattern (O'Neal, T.270–1; P.X. 8), and the inverted nine spot pattern (O'Neal, T.271; P.X. 8). The five spot and the nine spot pattern result in an injection well to recovery well ratio of one to one and one to three, respectively. (O'Neal, T.270–71.)

Long pipelines for transporting the water from its source to the treatment plant to the injection pumps and then to the injection wells may be required. These pipelines may need to be specially treated to withstand corrosive forces and the high pressures associated with the injection process. (Platt, T.709, 710.) Other facilities may be necessary for separation of oil from the water lifted by the recovery wells. Facilities may be necessary for preparing recovered water for reinjection, or disposing of recovered water in some other manner.

The important contribution that oil recovered through waterflooding operations makes to the oil needs of this country, and the necessary role of injection wells in that process, is undisputed. In 1973, approximately one billion barrels of oil were produced through the injection process. (Platt, T.722–23.) Thirty to fifty percent of all oil produced in the United States was attributable to fluid injection projects. (Platt,

T.743.) The injection well is a necessary and indispensible ingredient in the secondary recovery process. Professor Whiting, on cross-examination, was asked:

"Q. When you testified that an injection well is a producing well or a well that produces crude oil, didn't you mean in fact what you means is that it assists in the emitting of oil by the production well, the recovery well, at the surface of the earth?

A. I will say once again—and I guess other times if you insist on it—I teach my students that there is no question about the fundamental premise that there are three necessary parts of a secondary recovery system. Elements of it. The reservoir, the input well, and the production well—using your words. All of those are essential ingredients, and I think I should answer your question by saying without an injection well in secondary recovery there would be no oil production into the well bore of the production well you are talking about. *It is an essential ingredient of the system. Without an injection well you don't have secondary recovery.* This has been recognized I know for 40 years." (Emphasis added.)

(Whiting, T.193.) The Government expert, Mr. Burt, agreed with Professor Whiting, as follows:

"Q. Right. And, therefore, wouldn't you agree that an injection well is an absolute and necessary essential part of a secondary recovery waterflood producing system?

A. I don't think I ever said otherwise. I've always said it was essential to have an injection point."

(Burt, T.1062–63.) Mr. O'Neal testified that injection wells and recovery wells are "hydraulically linked." He explained:

"A. 'Hydraulic linkage' is merely a form of reservoir communication in one sense. As I mentioned before, we started out with a tiny sample of rock that is in a reservoir that is in a stannic conduit, the pore spaces, but those things are connected, they are not efficient pipelines, but they are connected from one end of the reservoir to another. And that is what you are able to utilize in conducting a waterflood, is that you use that communication, and then by injecting water into the well on the left you force that water out into the oil-bearing formation, and that provides the energy to move the oil and the water, and it also is sweeping the oil out of those pore spaces.

Q. All right. Mr. O'Neal, as I understand it, then, there is an hydraulic linkage between the injection well here and the recovery well here, is that correct?

A. That is correct. Those two wells are used in pairs."

(O'Neal, T.273–74.) The relationship described is rather like a pipeline with the injection well acting as one end and the recovery well acting as the other end. Nothing can flow out the one end of the pipeline in the absence of something being forced into the other end. An injection well provides the force. On cross-examination the witness clarified this relationship:

"Q. Now you testified in response to a question by Mr. Beck, the summary question, that producing, that injection wells, are wells that produce crude oil. You mean by that, do you not, that they help produce crude oil, isn't that a fact?

A. No. As I said for me the injection well, number one, is a well that produces crude oil, like that which was demonstrated on the model—

. . . . .

A. All right. What I said was that an injection well forces, by the use of water, puts energy in the reservoir, and displaces oil through the reservoir and up the recovery well. And, I said more than 'assist'—I said *it was the prime mover*, because if I

did not put that injection well in, I would have no more oil production." (Emphasis added.)

(O'Neal, T.351–52.) Mr. Eley testified similarly:

"A waterflood, certainly a waterflood, such as the Salem Unit—and this unit is typical of a successful waterflood unit—I can see it as a hydraulic system, you inject water into the injection wells, and put energy in the formation which moves oil and water to your recovery wells where you recover. In the absence of water injection, you would certainly, in this field, you would have no production at all. And today, today as of October 1, 1980, our injection program has resulted in the production of an additional 118 million barrels of oil, and will ultimately produce an additional 138 million barrels of oil. Now, this is, again, oil that would not be produced in the absence of injection wells. Injection wells are an essential part of your injection operation, and certainly in this sense injection wells do produce crude oil."

(Eley, T.434.) All of these principles were clearly and graphically demonstrated through the model of the oil reservoir. Movies of this demonstration were submitted as P.X. 175 and P.X. 176.

The defendant did aptly point out that other types of wells are present on oil leases. No other type of well, however, contributes to the recovery process in the manner that both injection and recovery wells do. These are the only two types of wells which cause oil to flow within the reservoir.

In many states, the entire process is heavily regulated. The materials submitted by the plaintiffs show that California, Colorado, Illinois, Kentucky, Michigan, Nebraska, New Mexico, Texas, Utah and Wyoming, all require producers to obtain permits prior to drilling a well for injection purposes. All of these states and Arkansas, Kansas, Montana, and Oklahoma require application and approval prior to instituting water injection. The approval necessary to institute waterflooding seems to be obtainable only after furnishing extensive studies on the feasibility of waterflooding. In Kansas, for example, an application to inject must show:

"(1) the location of the intake well; (2) the location of all oil and gas wells, including abandoned and drilling wells and dry holes, and the names of landowners and lessees within one-half mile of the intake well; (3) the formation from which wells are producing or have produced; (4) the name, description and depth of the formations to be flooded; (5) the openhole depths of each formation to be flooded; (6) the elevations of the top of the oil-or-gas-bearing formation in the intake well and the wells producing from the same formation within one-half mile radius of the intake well; (7) the log of the intake well or such information as is available; (8) descriptions of the intake well casing; (9) descriptions of the liquid, stating the kind, where obtained and the estimated amounts to be injected daily; (10) the names and addresses of the operators notified of the application and the date that such notice was given; (11) such other information as the commission may require to ascertain the flooding may be safely and legally made."

Kan.Admin.Reg. No. 82–2–502. Other states have similar requirements. See, e. g., Rule 401, Rules and Regs. of Neb. Oil and Gas Comm.; Rule 228.3, Gen.Rules and Regs. of Oil and Gas Comm. of Montana. See also, P.X. 48, which is form H–1 of the Texas Railroad Commission and is required to be completed prior to initiation of injection.

These natural and regulatory barriers to the institution of waterflooding render the process quite expensive. Even the defendant's expert engineer acknowledged: "The cost of a waterflood system is more than primary." (Burt, T.1073.) This fact was affirmed by other experts who testified: Shearin, T.536; McConnell, D.15–20; Platt, T.700–04. Moreover, as aptly pointed out by the Government's engineer, water injection is subject to the risk of failure. (Burt, T.1033, 37; G.X. G2–A through G2–E.)

State agencies have afforded injection wells special treatment in proration programs, to insure that their contribution to the production process is recognized. One of the goals of a system of proration or allowables is to maximize the ultimate recovery from each field, thereby preventing waste and conserving oil. (Coker, T.598; Baumel, T.663.)

This Court was treated to an extensive lesson in the method allowables are determined in Texas. The actions of the Texas regulators, the Texas Railroad Commission, are of particular interest since that oil rich state accounts for approximately one-third of the total oil production in the forty-eight continental United States. (Platt, T.723; Coker, T.624.) Mac Coker, who served the Texas Railroad Commission for 28 years, Jack K. Baumel, who worked for the Commission for 15 years, and designed the system of yardstick allowables used in Texas, and Bob Harris, who currently is director of the Oil and Gas Division of the Commission, provided the Court with a full picture of the functions of the allowable system in Texas. No individuals could possibly be more qualified to testify about the Texas practices than these three individuals, and their credibility was unsullied.

To establish an allowable for a water flood project, each well must undergo a test prior to injecting water into the formation. This test is required of all wells which are either converted from recovery wells or drilled as injection wells. (Coker, T.608.) The test required determines how much oil the well can yield in a twenty-four hour period. Thus, even if a well was drilled to be operated as an injection well, the operator must use that well as a recovery well for twenty-four hours to determine how much oil that well can recover in that period. (Coker, T.609.) The amount of oil that the well emits in that test period is assigned to that well as its allowable. (Coker, T.610.)

When the test is completed and the wells are converted to injection wells, the allowa-ble of those wells are transferred to other specific recovery wells on the property. (Id.) Thus, if prior to injection, an injection well has an allowable of five barrels per day, and a recovery well has an allowable of six barrels per day, the allowable of the injection·well can be transferred to the recovery well so that the recovery well could extract eleven barrels per day. (Coker, T.611.)

If the waterflood operation is able to produce more oil than this allowable permits, a different set of allowables comes into play. Rule 48, Texas Railroad Commission. The first step in increasing the allowable for waterflood projects is to assign a "marginal allowable" to the wells on the property. The allowables for the injection wells are transferred to the recovery wells. If the waterflood produces more than this allowable permits, a yardstick allowable is assigned to each well, including injection wells, and the allowables from the injection wells are transferred to the recovery wells (Coker, T.638.) Other higher allowables can be assigned after a hearing and are assigned on a lease basis rather than a well basis. (Coker, T.615–619.)

Mr. Coker made clear the reasons for allowing the transfer of allowables from injection to recovery wells:

"The transfer of an allowable concept was initiated by the Railroad Commission for two primary reasons: One, as an incentive to operators to initiate secondary recovery in order to increase the ultimate recovery from the various fields. Further, the transfer allowable concept was adopted and has been utilized for at least 40 years in recognition of the fact that the water injection wells are an integral part of the recovery system in secondary recovery projects."

(Coker, T.629.) State conservation practice recognizes the importance and necessity of secondary recovery, and the essential contribution of the injection well to secondary recovery.[3]

---

**3.** Notably, an allowable will not be given a salt water disposal well, unless that well is an injec-tion well. Rule 47, Texas R.R. Comm.

Louisiana has also recognized the role of injection wells in their allowable system. Not only does Louisiana allow the transfer of allowables from injection wells to recovery wells on a unit, but Louisiana also allows an extra allowable to be assigned to a property for each injection well. · This bonus allowable "was an incentive for operators to initiate secondary recovery early in the life of a reservoir or earlier than might be normally done to ensure that the maximum recovery from the reservoir is obtained." (Boudreaux, D.15.)

Oklahoma and New Mexico also allow the transfer of allowables in waterflood operations. New Mexico Oil Conservation Div. Rules and Regs., Rule 701 (1968); Corporation Commission of Oklahoma Rules and Regs., 2–240, 2–250, 2–261 (1973). The material before the Court shows no state in which production from secondary recovery projects is treated in a manner identical to production from primary recovery projects. The systems of allowables shown in the records before this Court show that the state regulators all recognize the role played by enhanced recovery techniques and the necessary role of injection wells in the production of crude oil. The state regulators recognize that the goals of the proration system—to prevent waste and to ensure maximum recovery of oil from a reservoir—can be achieved by providing for the role of injection wells when setting allowables.

Historically, federal agencies have recognized the identity of contribution to the oil production process made by recovery wells and injection wells on secondary recovery projects.

In 1944, the director of the Office of Economic Stabilization granted "stripper wells" an increase in price. The plan was designed to "keep stripper wells in operation, to encourage reopening and cleaning out of old wells, and to make secondary recovery projects feasible." 9 Fed.Reg. 7769. "Pools" which were averaging less than nine barrels of oil per well per day were allowed to increase prices. The regulations required calculation of:

"Daily Average per well production of pool during month of December 1943 in terms of 42-gallon barrels. (The number of wells to be considered the number of wells producing as of December 31, 1943.)" (Id.)

Although it is unclear whether this definition was subject to one standard interpretation or not, the only evidence this Court has as to the application of this provision to injection wells is the undisputed testimony that in Texas injection wells were included in determining qualification for the increased prices under that federal regulation. (Baumel, T.668, 671.)

Section 263 of the Internal Revenue Code allows operators an option either to deduct or capitalize intangible drilling and development costs "in the case of oil and gas wells." This provision has been implemented to include all intangible expenditures "incident to and necessary for the drilling of wells and preparation of wells for the production of oil and gas." Treas.Reg. Sec. 1.612–4(a). The I.R.S. recognizes that the costs incurred in drilling an injection well should be treated in the same manner as those costs incurred in drilling a recovery well, and are chargeable to capital or deductible as expenses. Rev.Rul. 69–583, 1969–2 C.B. 41. The I.R.S. thus has held that injection wells are within the term "oil wells" as used in Section 263 of the Internal Revenue Code.

The Mineral Land Leasing Act of 1920, Pub.L.No.146, Ch. 85, 41 Stat. 437, authorized the execution of oil and gas leases by the Secretary of the Interior on federal lands at royalties to be determined by the Secretary on the basis of competitive bidding. The Act itself provided a stripper well exemption from these standard royalty provisions:

"Whenever the average daily production of any oil well shall not exceed ten barrels per day, the Secretary of the Interior is authorized to reduce the royalty on future production when in his judgment the wells can not be successfully operated upon the royalty fixed in the lease."

The apparent purpose of this exemption was to allow marginal wells preferential

treatment to prevent abandonment and to insure maximum production.

In 1935, as a part of a general revision of this act, the exemption was rewritten to provide:

> "Whenever the average daily production of the oil wells on an entire lease or on any tract or portion thereof segregated for royalty purposes shall not exceed ten barrels per well per day, or where the cost of production of oil or gas is such as to render further production economically impracticable the Secretary of the Interior, *for the purpose of encouraging the greatest ultimate recovery of oil and in the interest of conservation of natural resources,* is authorized to reduce the royalty on future production when in his judgment the wells cannot be successfully operated upon the royalty fixed in the lease." (Emphasis added.)

Ch. 599, Sec. 1, 49 Stat. 676 (Aug. 8, 1935). In 1936, the statutory measure was implemented through a provision which provided that only wells which yielded commercial volumes of production during part of a month were to be considered in ascertaining the well count for determining average daily production. Injection wells were to be counted. 56 I.D. 415, 427 (1936). This holding has remained unchanged and is currently embodied in Section 221.49 of 30 C.F.R.:

> "Sliding and step-scale royalties are based on the average daily production per well. The supervisor shall specify which wells on a leasehold are commercially productive ... but only wells which yield a commercial volume of production during at least part of the month shall be considered in ascertaining the average daily production per well.
>
> . . . . .
>
> "(b) Wells approved by the supervisor as input wells shall be counted as producing wells for the entire month if so used 15 days or more during the month, and disregarded if so used less than 15 days during the month."

Although the statutory stripper well exemption from the royalty rates was subsumed into a general provision granting the Secretary of the Interior power to modify royalty rates, the exemption continues in the administrative practices of the Department of Interior.

The testimony of John Duletsky provided the Court with great insight into the manner in which this provision was actually applied by the Department of Interior (DOI). Mr. Duletsky had been a long time employee of the DOI and had served as a senior official in a position within the DOI which dealt with the application of this regulation. The Court believes that there could be no individual more knowledgeable about the treatment of injection wells for purposes of the step or sliding scale royalty than Mr. Duletsky. He testified that to be counted as a well for purposes of determining average daily production, an injection well had to meet two conditions. First, the injection well had to be completed in the correct oil bearing formation. Second, the well must have been injecting water into the oil bearing formation for at least fifteen days a month. (Duletsky, T.577–78.) He dispelled any doubt that the term "input well" used in the regulation, is synonymous with the term "injection well." (Duletsky, T.575–76.) This testimony is buttressed by plaintiffs' Exhibit 45, which is a chapter from the DOI Conservation District Manual, containing rules and procedures relating to the variable regulatory rate and well count. See, P.X. 45, pp. 6–7.

Duletsky stated it was his belief that the inclusion of injection wells was brought about by the Government's concern "in the public interest to maximize the ultimate recovery from a reservoir, prevention of waste, and conservation." (T.579.)

■ Duletsky's testimony shows that the DOI treats injection wells in a manner similar to recovery wells for purposes of determining well count. An active injection well is routinely counted as a well for determining average daily production per well. A shut-in injection well is usually treated as a shut-in recovery well and excluded from the well count. Beyond all question, DOI regulation 221.49(b) is not a narrow, limited

exception niggardly administered by a secretary who exercises discretion to exclude injection wells. This section establishes the general proposition that active injection wells are productive wells and are to be included in the well count for purposes of the variable royalty.[4]

## II. STATUTORY BACKGROUND

In the early 1970's, acting pursuant to the Economic Stabilization Act of 1970, 12 U.S. C.A. Sec. 1904 (note), the Cost of Living Council (CLC) promulgated a comprehensive series of regulations governing the maximum prices at which domestic crude oil and refined petroleum products could be sold. In general, the regulations established a "two tier" price system for production from each "property," and set a ceiling on the prices charged for the first sale of domestic crude oil. This system was designed to halt the inflationary spiral of crude oil prices while limiting the disincentive effect of oil price regulations. 6 C.F.R. Sec. 150.354.

The statutory stripper well exemption originated as an amendment to S. 1081 (TA-PAA) offered by Senator Bartlett, United States Senator from Oklahoma, a principal oil-producing state, on the Senate floor. This original amendment read:

"Those oil leases whose daily average production per well does not exceed that of a stripper well of not more than ten barrels of oil per day shall be exempt from any allocation or price restraints established by any act of law."

This amendment was adopted by the Senate and subsequently amended by Senator Jackson to read:

"The first sale of crude oil and natural gas liquids produced from any lease whose average daily production of such substances does not exceed ten barrels per well shall not be subject to price restraints established pursuant to the Economic Stabilization Act of 1970 as amended, or to any allocation program for fuels or petroleum established pursuant to that Act or to any Federal law for the allocation of fuels or petroleum."

Senator Jackson also amended the amendment to provide that the agency designated to administer the allocation program be allowed to promulgate regulations implementing the exemption.

The exemption as amended was enacted as Section 406 of the Trans-Alaska Pipeline Authorization Act, Pub.L.93–153, 87 Stat. 590 (codified at 12 U.S.C. § 1904).[5] The Conference Committee added a provision requiring leases to be operated at the maximum feasible rate. Regulations implementing this exemption were published by the Cost of Living Council (CLC) at 38 Fed.Reg. 32494 (November 26, 1973) (6 C.F.R. Sec. 150.54(s)). These regulations defined the terms "average daily production" as follows:

"Average daily production" means the qualified maximum total production of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar month, divided by a number equal to the number of days in that month times the number of wells

---

4. Other types of wells are not allowed to be counted. Abandoned, disposal, water source, observation wells, are not permitted to be counted. Under certain circumstances, shut in wells are allowed to be counted only if approved by the Supervisor. P.X. 45, p. 6.

5. "Sec. 406 (a) The first sale of crude oil and natural gas liquids produced from any lease whose average daily production of such substances for the preceding calendar month does not exceed ten barrels per well shall not be subject to price restraints established pursuant to the Economic Stabilization Act of 1970, as amended, or to any allocation program for fuels

or petroleum established pursuant to that Act or to any Federal law for the allocation of fuels or petroleum.

(b) To qualify for the exemption under this section, a lease must be operating at the maximum feasible rate of production and in accord with recognized conservation practices.

(c) The agency designated by the President or by law to implement any such fuels or petroleum allocation program is authorized to conduct inspections to insure compliance with this section and shall promulgate and cause to be published regulations implementing the provisions of this section."

which produced crude petroleum and petroleum condensates, including natural gas liquids, from that property in that month. To qualify as maximum total production, each well on the property must have been maintained at the maximum feasible rate of production, in accordance with recognized conservation practices, and not significantly curtailed by reason of mechanical failure or other disruption in production."

On November 27, 1973, the President signed into law the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub.L.No. 93–159, 87 Stat. 628 (codified at 15 U.S.C. Sec. 751). Section 4(a) of the EPAA required the President promulgate regulations providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts and at prices specified in regulations.

Subparagraph 4(e)(2)(A) of the EPAA also contained a stripper exemption.[6] Regulations implementing this provision were published as a revised version of 6 C.F.R. Sec. 150.54(s), 38 Fed.Reg. 34464 (December 14, 1973). These regulations were identical to the earlier regulations in all respects important to this case.

On December 4, 1973, the President issued Executive Order No. 11748, establishing the Federal Energy Office (FEO) and delegating to the FEO primary responsibility for administering and enforcing the petroleum allocation and pricing provisions of the EPAA. 38 Fed.Reg. 33575 (December 6, 1973). The FEO thereafter adopted Mandatory Petroleum Price Regulations which incorporated the petroleum pricing regulations that had originally been promulgated by the CLC. The CLC's stripper well lease exemption was ultimately incorporated in these regulations, when on January 14, 1974, FEO adopted and reissued the CLC definitions of "stripper well lease" and

"average daily production." 10 C.F.R. § 210.32(b), being identical to 6 C.F.R. § 150.54(s).

On May 7, 1974, the President signed into law an act of Congress known as the Federal Energy Administration Act of 1974 (FEAA), 15 U.S.C. Sec. 761 et seq., Pub.L. No.93–275, 88 Stat. 96. The FEAA established the Federal Energy Administration (FEA) and authorized the President to delegate to the FEA authority vested in the President by law.

On June 25, 1974, the President issued Executive Order No. 11790. 39 Fed.Reg. 23185 (June 27, 1974). That Executive Order, in addition to giving notice that the FEAA was to become effective as of June 27, 1974, abolished the FEO, revoked Executive Order No. 11748, and delegated to the FEA all authority vested in the President by the EPAA. The duty of administering and enforcing the petroleum allocation and pricing provisions of the EPAA was thereby assigned to the FEA, and the implementing regulations became the responsibility of the FEA.

On December 19, 1974, the FEA issued Ruling 1974–29, 39 Fed.Reg. 44414 (December 24, 1974). That Ruling held that injection wells were not to be counted as wells for purposes of determining whether the average daily production per well from a property exceeded ten barrels in the preceding calendar year.

The relevant portions of the Ruling read as follows:

"*ISSUE*: Is an 'injection well' a "well" for the purpose of determining whether the average daily production of a property was 10 barrels or less per well in the preceding calendar year, for purposes of the stripper well lease exemption of 10 C.F.R. § 210.32?

---

**6.** "(2)(A) The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well.

(B) To qualify for the exemption under this paragraph, a lease must be operating at the

maximum feasible rate of production and in accord with recognized conservation practices.

(C) Any agency designated by the President under section 5(b) for such purpose is authorized to conduct inspections to insure compliance with this paragraph and shall promulgate and cause to be published regulations implementing the provisions of this paragraph."

"*RULING*: No. Under the FEA regulations, the first sale of domestic crude petroleum and petroleum condensates, including natural gas liquids, produced from any stripper well lease is exempt from the mandatory price and allocation regulations. A stripper well lease is defined as a property whose average daily production did not exceed 10 barrels per day per well during the preceding calendar year. 'Average daily production' is further defined in 10 C.F.R.. § 210.32(b) as:

'The qualified maximum total production of domestic crude petroleum condensates, including natural gas liquids, produced from a property during the preceding calendar year, divided by a number equal to the number of wells which produced crude petroleum and petroleum condensates, including natural gas liquids from that property in that year.'

"Thus, the FEA regulations by their specific language provide that only wells 'which produce crude petroleum' are to be counted in calculating average daily production for the purpose of determining whether the stripper well lease exemption applies. While injection techniques help to 'produce' crude petroleum, they are not wells which themselves 'produce' crude petroleum. Therefore, wells which did not actually yield or produce crude petroleum during the preceding calendar year are not production wells for this purpose. Whether the non-producing well was an 'injection' well, a disposal well, a dry well, a spent well or a shut-in well will not change this result."

## III. THE DOE'S EXCLUSION OF INJECTION WELLS CONFLICTS WITH CONGRESSIONAL INTENT

As stated in this Court's order of June 11, 1980, the Court believes that TECA has held that the regulation defining average daily production itself mandated the exclusion of injection wells from the well count. The focus of this decision, therefore, is upon the underlying regulation and not upon the ruling.

■ The legal foundation and proper procedure for this Court to follow in reviewing the regulation at issue in this case was stated by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Three distinct inquiries are required. First, this Court must determine whether the actions of the agency were within the agency's authority. Second, the Court must decide whether the action by the agency was "arbitrary, capricious or an abuse of discretion, or otherwise not in accordance with law." Finally, this Court must decide whether the agency's actions followed the necessary procedural requirements.

In the prior proceedings in this case the third inquiry has been satisfied. Both the regulation and ruling at issue have been determined to be procedurally valid. The Court need now only consider the first two issues.

The defendant contends that the agency's interpretation of the statute to exclude injection wells from the well count must control this Court. Much of the problem with this position, as will be more fully noted, is that the only real clue of how the agency viewed the statute is the result it reached in holding that injection wells cannot be counted.

■ The Court is acutely aware that an agency's interpretation of a statute which the agency is authorized to administer is entitled to "substantial deference." *Quern v. Mandley*, 436 U.S. 725, 736, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978). This deference, however, does not render an agency's interpretation exempt from judicial scrutiny. The deference due any interpretation "is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose and history." *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S.Ct. 790, 800, 58 L.Ed.2d 808 (1979).

"The weight to be given to an administrative interpretation depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

and all of those factors which give it power to persuade, if lacking power to control.' " *Standard Oil Co. v. D. O. E.*, 596 F.2d 1029, 1056 (Em.App.1978), quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944). The Court has an obligation to examine anew the legislative history and purpose of the statute.[7]

■■ The interpretation given the statute did not evolve as a result of a comprehensive evidentiary hearing, as is done in many instances. Nor does the interpretation given the statute appear to have been the product of the expertise of the agency. Rather, the interpretation seems to have been the product of the agency's reading of congressional intent, principally from language of the Act alone. Divining congressional intent behind a statute is a task to which courts are at least equally suited as are administrative agencies. This fact mitigates against according the interpretation extra authoritative weight.

In *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970), the Supreme Court was faced with a challenge to a regulation promulgated by the Secretary of Agriculture which defined "making a crop." The Court held that defining that term was not a discretionary judgment of the Executive Branch:

> "On the contrary, since the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction. See *Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 268–70, 80 S.Ct. 1122, 1126–1127, 4 L.Ed.2d 1208. 'The role of the courts should, in particular, be viewed hospitably where . . . the question sought to be reviewed does not significantly engage the agency's expertise. "Where the only or principal dispute relates to the meaning of the statutory term . . ." (the controversy) presents issues on which

courts, and not (administrators), are relatively more expert.' *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 14, 88 S.Ct. 651, 658–659, 19 L.Ed.2d 787 (Harlan, J. dissenting)."

See also, *Wilderness Society v. Morton*, 479 F.2d 842, 866 (D.C.Cir.1973), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973); *UPG, Inc. v. Edwards*, 647 F.2d 147, at 156 n. 23 (Em.App.1981).

■ The defendant argues that other factors are also important in determining whether the agency interpretation should be given extra authoritative weight. Three questions are generally considered when looking at an agency interpretation. Was the interpretation contemporaneous with the enactment of the statute? Has the interpretation consistently been followed over a long period of time? Was the interpretation outstanding at the time of a reenactment of the statute? *Energy Consumers and Producers Association, Inc. v. D. O. E.*, 632 F.2d 129, 143 (Em.App.1980).

It is true that, in this case, the regulation was issued contemporaneously with the statute. It is equally true, however, that the regulation was not drafted with the intent either to exclude or to include injection wells from the well count. There raged within the agency a great debate as to whether injection wells were within the statutory exemption. The documentary material before the Court shows that the proper interpretation to be given the regulation and statute was debated until the time that Ruling 1974–29 was promulgated. See, e. g., P.X. 72, 73, 75, 85, 92, 131, 132, 136, 137, 139, 140. See also, G.X. Z–1. All individuals involved in the agency action with respect to injection wells who came before this Court agreed that the inclusion of injection wells in the stripper well exemption was an unresolved issue until the time of the Ruling.

Linda Buck, in May, 1974, prepared a memorandum, the purpose of which "was to devise a method of proposing a clarification

---

7. The Court believes that this obligation is even greater in the present case where the Court has found the interpretation to have been arrived at in an arbitrary and capricious manner. See part IV, infra.

to what we believed to be an ambiguous regulation." (Buck D. 41.) George Biondi recognized in July of 1974, that the issue was unresolved. (Biondi, D.36–7.) See also, Walker, D. 59, 64, Ware T. 957, 1005–16, 1009–10. Phillip Essley recognized that the regulation did not conclusively decide the issue, and that the issue was not finally determined until the release of Ruling 1974–29 in December, 1974, more than one year after the passage of the stripper well exemption. (Essley, T. 1208–15.)

 Since the construction ultimately arrived at by the agency was not one made "soon after the time of enactment," it does not qualify as a contemporaneous construction. *Russ v. Wilkins*, 624 F.2d 914, 923 (9th Cir. 1980). The evidence before the Court shows that there was no single contemporaneous construction of the statute or regulation to exclude injection wells from the well count. This factor does not indicate that extra authoritative weight need be given the agency interpretation.

Nor does the evidence show that there was one consistent and uniform application of the statute and regulation to exclude injection wells. The record before the Court contains examples of times at which oil producers were advised to count injection wells.

On December 6, 1973, Robert Weldon, who was then Engineering Supervisor of Joint Operations for Clinton Oil Company (now Energy Reserves Group, Inc.), contacted the CLC to determine whether injection wells could be included in the well count. Mr. Weldon was referred to Andrew Drance, of the CLC, who advised him that injection wells were to be included in the well count. (Weldon, D. 21–4.) Mr. Drance's position within the agency was close to that of the regulation's draftors.

On December 7, 1973, Ernest T. Pelikan, who was then in the Management Services Department of Arthur Young & Company, contacted the CLC on behalf of Suburban Propane Gas Corporation, another of the plaintiffs. Mr. Pelikan also had a telephone conversation with Andrew Drance and was advised that injection wells could be included in the well count. (Pelikan, D.27–8.)

In January, 1974, August Erickson, then Vice-President of Sklar & Phillips, contacted Eugene Waters of the Internal Revenue Service, the agency delegated responsibility at that time for enforcing the petroleum pricing regulations. On January 30, 1974, Waters and W. M. Meriwether, of the I.R.S., telephoned Erickson and advised him that injection wells could be included in the well count. (Erickson, D. 28–31.) The oral advice that injection wells could be counted was confirmed by a letter from Waters on January 31, 1974 (P.X. 54).

In late 1973, James H. Roark and Carl E. Stone, of King Resources Company (now Phoenix Resources Company) were advised by I.R.S. officials in Oklahoma City that injection wells could be included in the well count. (Roark, D.12–3, 46).

In October, 1974, Larry White, Dallas Area Manager of the F.E.O.'s Region VI Office, advised a New Mexico producer that injection wells could be included in the well count in calculating average daily production under the stripper well exemption regulation. (White, D.26, 39, 71–7.) White based this advice on the regulations and on Form P–1 of the Texas Railroad Commission, Oil & Gas Division, which included injection wells as producing wells. (White, D.85–7, 99, 101.) White's advice was founded in part on a mid-May, 1974, letter from the Regional Counsel of Region VI, advising a Dallas-based company that injection wells were to be included in the well count, a copy of which he had seen. (White, D.26–8, 32, 75–6.) White established a training program for the agency's auditors in Region VI. (White, D. 82–7.) This program, adopted by the national office, instructed auditors that the stripper well exemption permitted producers to include injection wells in the well count. (White, D.82–7.)

On October 2, 1974, M. H. McConnell, of Phillips Petroleum Company, traveled to Washington, D.C., to obtain guidance from agency officials concerning the injection well issue. McConnell was referred to and met with Roy Whitson, Rendel Alldredge, and a Mr. Kourkoumelis of the F.E.A. After a lengthy conference, McConnell was

advised that injection wells should be counted. (McConnell, D.304.)

In August and September, 1974, Audie Moore, of Kewanee Oil Company, also visited Washington, D.C., to obtain guidance as to the meaning of the agency's stripper regulation. He initially met with Rendel Alldredge and Bob Kahl, of the F.E.A. (Moore, D.29.) At that meeting, Alldredge and Kahl expressed the view that injection wells could be included in the well count. (Moore, D.30–1.) In order to obtain additional confirmation, however, Moore met on September 4, 1974, with four other officials of the Compliance Division of F.E.A. At the conclusion of that meeting Moore was advised that injection wells could be included in the well count. (Moore, D.37–8.)

 The defendant's argument that only official interpretations should be examined is patently incorrect, and has been rejected by the Court on at least one prior occasion. See Order filed June 11, 1980. TECA, in *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1056 (Em.App. 1978), held that statements of lower level officials should not be disregarded:

"The FEA contends that only the FEA's General Counsel, his staff, and other 'high level policy makers' had the authority to issue official interpretations of its regulations. Consequently, it argues, in determining what the agency's interpretation was this court should ignore the actions of the FEA auditors and other lower level officials during the relevant period. This court held in *California Molasses Co. v. California & Hawaiian Sugar Co.*, 551 F.2d 1230, 1235, 1239 (Em.App. 1977), that the interpretation of agents of the IRS, which had been charged with enforcing price controls, were entitled to deference by the courts. We recognize, as the FEA argues, that California Molasses is not precisely in point. We do conclude, however, that the statements by the FEA auditors and other lower level officials are entitled to weight in determining the thoroughness of the FEA's consideration of its regulations, the validity of its reasoning, and its consistency with earlier and later pronouncements."

This Court considered the evidence of the interpretation given by lower level officials only as it impacted on the consistency and contemporaneous construction issues.

The defendant contends that the *Standard Oil* rule is applicable only where the only announced public position is contrary to the formal interpretation eventually adopted by the agency. 596 F.2d at 1056. The defendant does not explain why the broad statement cited above should be so limited. If this Court were to accept this argument, the "consistency" inquiry would be relevant only where the agency's final position is contrary to all advice theretofore given. This Court can see no reason that the consistency inquiry would not be equally applicable in this case where not all the advice expressed was contrary to the final position. The concerns raised by the defendant more nearly reflect on the extent of consistency or inconsistency rather than whether it is properly an issue for this Court.

The record before the Court does disclose that perhaps the bulk of the advice given by the agency was to the effect that injection wells should not be counted. The reason that this advice was given does not seem to be that the interpretation was uniformly accepted as the "true" interpretation of the regulation or statute—rather, the interpretation was the most favorable to the agency, and represented the most conservative advice. Linda Buck identified the reasons that this advice was given:

"Q. Okay. Now, let's talk a little bit about how the advice you—what the advice you gave to crude oil producers was characterized. As I understand what your testimony has been thus far, the advice you gave to crude oil purchasers when an inquiry was made about the injection well issue was basically in four parts: one, that the regulation was unclear and ambiguous; two, that the issue was unresolved in the agency; three, that the agency was working on the issue; and four, because the issue remained unresolved, that if the producer included

injection wells in the well count they did so at their own risk.

A. I hope I said it that well; but, yes, that is the essence." (Buck, D.74–5.)

■ The Court concludes that the current interpretation is not one which has been followed consistently over a long period of time, such as would justify special deference.

■ The third inquiry the Court must make in determining whether the interpretation is entitled to special deference is whether the interpretation was outstanding at the time of a reenactment of the statute. The stripper well exemption was reenacted in § 121 of the Energy Conservation and Production Act of 1976, P.L. 94–385, 90 Stat. 1125 (1976). At that time there was no attempt to change the interpretation. This fact is a reason for deference to the existing interpretation. See, *Energy Consumers and Producers Association, Inc. v. D. O. E.*, 632 F.2d 129, 144 (Em.App.1980). The weight to be accorded this fact, however, is greatly lessened by the fact that there was actual disagreement with the interpretation by Congress *following* the reenactment.

In 1977, Senator Bartlett proposed that the stripper well provision be amended to add:

"Included in the count of the total number of wells on a property shall be all wells producing crude oil and all wells unitized for the purpose of injecting water and/or other materials into a producing reservoir for the purpose of enhancing oil recovery."

123 Cong.Rec.S. 18212 (Oct. 31, 1977). Senator Jackson, a senator from the non-oil producing state of Washington, opposed this amendment:

"The proponents are urging here, in effect, that it clarifies the intent of the so-called stripper well amendment. Mr. President, I supported the original exemption from price controls for the so-called stripper wells.

"I point out that the language of the existing law expressly refers to wells producing crude oil. It does not include injection wells, nor was it intended to. The effect of the amendment would be to expand the number of crude oil producing properties which are exempt from price controls."

123 Cong.Rec.S. 19213. Senator Bellmon, of Oklahoma, purportedly familiar with oil industry practices, on the other hand, supported the amendment:

"Mr. President, very briefly, I would simply like to say I consider it to be senseless not to permit the counting of injection wells when determining average daily production. If these are not oil wells in the strict sense of the word, they are certainly essential to oil production. I felt, when we passed the stripped [sic] well amendment initially, they would be included. The Interior Department has long counted injection wells. I am not sure Members of the Senate realize this, but the Interior Department has long counted injection wells in the administration of the Federal mineral leasing program. This is not anything new we are trying to do. It has been the custom already in the Interior Department and has been for some time.

"When we originally enacted the stripper exemption, and when we reenacted it in 1976, I certainly believed that the FEA (now Department of Energy) would follow the very sensible precedent set by the Interior Department."

123 Cong.Rec.S. 18215. The Senate disagreed with Senator Jackson. The proposed amendment passed the Senate, but no similar provision was contained in the House bill, and the Conference Committee failed to adopt the proposed amendment. Conference Committee on Energy Tax Act, House Conf.Rep.No.95–1773, 95th Cong. 2d Sess. 57 (Oct. 11, 1978) [1978] U.S.Code, Cong. & Admin.News 8087.

■ The Court believes that the simple fact that Congress was debating its original intent in enacting the stripper well exemption long after reenactment critically weakens the claim that reenactment constituted ratification. This Court, therefore, believes that this factor does not require additional weight be accorded the interpretation.

■ The Court believes that none of these factors require the Court to grant the agency's interpretation deference to the extent that the Court must be bound by that holding. This Court must exercise its obligation to review the statute and legislative history to determine whether the agency's position can be sustained, or whether the meaning, purpose and history of the statute requires a contrary construction.

■ The starting point for any consideration of the meaning of a legislative enactment is the language of that act. The statutory stripper well exemption refers to "crude oil . . . from any lease whose average daily production of such substances . . . does not exceed ten barrels per well. . . ." In the context of this statute, the word "well" is unrestricted. Unless some indication to the contrary is present, the Court must conclude that the term "well" is intended to be given its ordinary meaning. No one has seriously contended that an injection well is not within the generic term "well." The Court believes that simple reliance upon the statutory language is a dangerous approach to determining the meaning of the statute. As stated in *New York State Commission on Cable Television v. F. C. C.*, 571 F.2d 95, 98 (2 Cir. 1978), *cert. denied*, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112:

> "Mere incantation of the plain meaning rule, without placing the language to be construed in its proper framework, cannot substitute for a meaningful analysis. For we must remember Judge Learned Hand's stricture that '[t]here is no surer way to misread any document than to read it literally . . .' *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir. 1944) (concurring), *aff'd sub nom. Gemsco, Inc. v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). And as Professor Cox wisely noted, '[n]o one has ever suggested that the courts must always follow the letter of a statute regardless of the outcome, nor does any one contend that the words may be entirely disregarded. The issue is where to strike the balance.' Cox, *Judge Learned Hand and the Interpretation of Statutes*, 60 Harv.L.Rev. 370, 376 (1947). The appropriate methodolo-

gy, then, is to look to the 'common sense' of the statute or regulation, to its purpose, to the practical consequences of the suggested interpretations, and to the agency's own interpretation for what light each inquiry might shed. See *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543–44, 60 S.Ct. [1059] [1063–1064] 1069, 84 L.Ed. 1345 (1940)."

The legislative history behind the stripper well exemption can best be described as sketchy.

The Conference report to the TAPAA exemption contains some indication of the intent of Congress in passing this exemption:

> "The purpose of exempting small stripper wells—wells whose average daily production does not exceed ten barrels per well—from the price restraints of the Economic Stabilization Act (now Phase IV) and from any system of mandatory fuel allocation is to insure that direct or indirect price ceilings do not have the effect of resulting in any loss of domestic crude oil production from the premature shutdown of stripper wells for economic reasons."

[1973] U.S.Code, Cong. and Admin.News, 2417, 2523, 2531. The Conference report noted that this exemption:

> "[w]ill encourage owners and operators of stripper wells to maintain production and to keep these wells in operation for longer periods of time than would be possible if the value of their crude oil production were determined under Phase IV price ceilings. This increased incentive will, it is anticipated, permit stripper well operators to make new investments in the eligible wells and improve the gathering and other facilities for moving this oil to market."

Id. at 2532. Senator Bartlett, also an Oklahoma senator and the drafter of this exemption, noted the benefits of the exemption when he proposed the measure:

"There are three reasons that adoption of this amendment will help to maintain current oil production:

First. The ability for the operator of a stripper well to seek higher prices for his crude oil would help to offset the high costs of the equipment necessary to lift the crude oil from the reservoir after the natural pressure mechanism of the producing formation has been depleted. For example, a pumping well could be operated longer because of the more favorable economics.

Second. There would be an incentive to do remedial work on the well. Most remedial work requires a large investment from the operator. Whether or not he makes this investment depends upon the likelihood of recovering his investment with a reasonable profit.

The third reason is that secondary oil recovery projects would be encouraged. Projects that up to now have been uneconomical to initiate and that have remained in producers' file cabinets would now move forward to help flush more oil out of the stingy oil reservoir."

119 Cong.Rec. 23874 (July 14, 1973). Sponsors of the measure repeatedly pointed out that this measure would allow wells to provide oil that otherwise would have to be purchased from foreign countries. See, *Remarks of Sen. Hansen*, 119 Cong.Rec. 23875–76; *Remarks of Sen. Cook*, 119 Cong. Rec. 23876; *Remarks of Sen. Bartlett*, Id. Senator Fannin pointed out that the proposed amendment was "really a conservation measure and provides an incentive not to leave oil in the ground." 119 Cong.Rec. at 23877.

The subject of secondary recovery was also mentioned by the senators. Senator Cook suggested that:

"by far the biggest percentage of production from stripper wells, 10 barrels or less, is secondary or tertiary recovery. The lives of those wells have passed, and they are in the process of bleeding that well or pumping to the best of their ability to get what is left. However, once they stop that, that source is gone."

Senator Bartlett also mentioned secondary recovery:

"I merely want to say that most of the stripper production that a major would have—and it would be very little—would be production that the major is hoping to waterflood or use a secondary recovery program, which is a tremendous operation and is a very high cost operation, even though they may later produce a lot more oil."

"This is a conservation program and I think it is needed, regardless of who is providing the money and the leadership." 119 Cong.Rec. at 23878.

■ These statements and the entirety of the legislative history show the underlying purpose of the statute. The stripper well exemption was designed to encourage the operation of marginally productive wells to produce oil that otherwise would not be produced. Congress clearly believed that it was better to allow owners of leases with marginally economic wells to increase price to the level of foreign oil prices than to have the oil left permanently in the oil reservoir. Congress made the policy determination that that point was reached when the per well production of a lease reached ten barrels per day.

Congress, however, recognized that granting this exemption created an opportunity for abuse.

"The Congress intends that the provisions of this section will be strictly enforced and regulated by the administering agency to insure that the limited exemption of this class of wells for the express purposes described above is not in any way broadened. To achieve this, Congress authorizes on-site inspections to insure compliance. Congress also directs that the administering agency shall promulgate regulations to implement the provisions of this section before it becomes operative. The Conferees expect the administering agency *to utilize State data regarding production volumes,* and to provide by regulation safeguards against the manipulation or gerrymandering *of lease units* in a manner that evades the price control and allocation programs.

"These regulations shall be so designed as to provide safeguards against any abuse, over-reaching or altering of *normal patterns of operations* to achieve a benefit under this section which would not otherwise be available. Congress specifically intends that the regulations shall, among other things, prevent any 'gerrymandering' *of leases* to average down high production wells with a number of low production stripper wells to remove the high production wells from price ceilings. The *sole purpose and objective* of this Section 406 is to keep stripper wells—those producing less than ten barrels per day—in production and to insure that the crude oil they produce continues to be available for U.S. refineries and U.S. consumers. It is not intended to confer any benefit on the owners and operators of wells producing in excess of ten barrels per day." (Emphasis supplied.)

U.S.Code, Cong. and Admin.News, 2532–53.

The plaintiffs argue that the legislative references to secondary recovery clearly show an intent to include injection wells in the well count. The Court has carefully reviewed all the legislative history and is unable to conclude with any degree of certainty that the congressmen who considered this amendment indicated their intent to include or exclude the counting of injection wells. Clearly, the amendment was intended to be applicable to and to encourage oil recovery utilizing normal secondary recovery methods. While this amendment alone, does not conclusively establish an intent to require the counting of injection wells, it does reference state data and production practices as well as normal patterns of operations in the oil industry.

The defendant's counsel in this case argues that the legislative history conclusively demonstrates that Congress intended only recovery wells be included in the well count. In support of this argument the defendant cites numerous references by legislators debating this measure to "stripper wells producing ..." or "stripper wells that produce ..." or "production from such wells...." See defendant's post trial brief at 13. Several observations can be made

about this theory. First, this interpretation is potentially in conflict with the wording of the statute, which focused not on wells which produced, but rather which looked to leases which produced. Were this Court to accept the defendant's theory, the exemption would clearly be constricted beyond the meaning of its plain words.

Second, this argument can only begin to be persuasive if the only possible intended meaning of the senators who used the word "produce" was "emit from the wellhead." The Court finds it impossible to conclude that such a narrow meaning was intended by these senators. It is equally plausible that these senators were using the word "produce" in the same sense that eminent experts used that word when they described how injection wells "produce" oil. See pp. 1244–1246, supra, or as the DOI used the word when talking of "commercially productive" wells.

█ The defendant attempted to bolster this theory by parading before the Court a large number of forms utilized in the oil industry to record production data. The defendant contended that these documents somehow established that "produce" has the limited meaning defendant ascribes to it. This Court declines the defendant's invitation to elevate forms over substance. The fact that some of these forms utilize the term "production well" to describe recovery wells does not mean that only these wells "produce" crude oil. In fact, many of these forms utilize the word "produce" in the more general sense suggested by the plaintiffs. (Burt, T.1045.) The Court concludes that the Congressmen did not intend to prohibit the counting of injection wells when they made references to wells which "produce" crude oil. "Produce," when used by these Congressmen, was not intended to act as a narrow term of art to denote only recovery wells.

The Court noted that it does not appear that these remarks by senators were relied upon in the original formulation of the regulation. Indeed, even the Ruling does not rely upon these remarks in holding that injection wells cannot be counted. The

Court believes that this theory of Congressional intent is a post hoc rationalization of the attorneys representing the Department, rather than the determination of an agency official. The Supreme Court, in *Investment Company v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), cautioned against relying upon such theories. That case dealt with the interpretation to be given provisions in a banking statute at pp. 628 and 1097 of the respective cited case reporters, viz.:

> "The difficulty here is that the Comptroller adopted no expressly articulated position at the administrative level as to the meaning and impact of the provisions of §§ 16 and 21 as they affect bank investment funds. The Comptroller promulgated Regulation 9 without opinion or accompanying statement. His subsequent report to Congress did not advert to the prohibitions of the Glass-Steagall Act.... To be sure, counsel for the Comptroller in the course of this litigation and specifically in his briefs and oral argument in this Court, has rationalized the basis of Regulation 9 with great professional competence. But this is hardly tantamount to an administrative interpretation of §§ 16 and 21. In *Burlington Truck Lines v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207, we said, 'The courts may not accept appellate counsel's post hoc rationalizations for agency action.... For the courts to substitute their or counsel's discretion for that of the [agency] is incompatible with the orderly functioning of the process of judicial review.' Id., at 168–169, 83 S.Ct. at 246. Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands. It is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress. Quite obviously the Comptroller should not grant new authority to national banks until he is satisfied that the exercise of this authority will not violate the intent of the banking laws. If he faces such questions only after he has acted, there is substantial danger that the momentum generated by initial approval may seriously impair the enforcement of the banking laws that Congress enacted."

Defendant's counsel also argues that the exemption was only designed to reach wells which were traditionally considered "stripper wells." This argument does appear to be something more than post hoc rationalization by department attorneys, as there is some evidence that this belief was present within the agency. It does not appear, however, that this consideration played any part in the decision concerning the regulation. This belief cannot be found in Ruling 1974–29 or in any materials which were circulated within the agency concerning the issue of whether to include or exclude injection wells. Ruling 1974–28, however, contains some reference to the belief that the stripper well exemption was to be construed only to include wells traditionally labelled "stripper wells." That Ruling stated in part:

> "This interpretation of a stripper well lease comports with industry usage and the congressional intent in providing for a stripper well lease exemption in the Emergency Petroleum Allocation Act of 1973. The phrase 'stripper well' has long been understood in the petroleum industry to refer only to a well which produces oil, or oil with associated gas. The 'stripper well' concept, commonly measured at ten barrels per day, has never extended to gas wells, whose production of liquids is always marginal by definition."

39 Fed.Reg. 4414 (Dec. 24, 1974). Senator Bartlett, the senator who proposed the amendment recognized the traditional definition of a stripper well: "By definition a stripper well averages 10 barrels of oil per day or less." 119 Cong.Rec. 23873 (July 14, 1973). Reliance on the traditional definition of stripper wells, however, potentially leads to results contrary to the language of the statute. The language of the statute focused on leases, not on individual wells. The scope of the exemption was not drawn to be coextensive with the traditional scope of the term "stripper well." Since the exemption focused on a lease, a given recov-

ery well could emit 100 barrels a day, and if the per well average on the lease was 10 barrels a day or less the well would qualify as a stripper well.

In the post-trial brief the defendant argues:

"There is absolutely no indication, however, that Congress, in drafting this statute, was focusing on anything other than low production wells in the primary production phase. There is not a whisper in the statute or Conference Report on injection wells or secondary recovery operations.

"When the statute was written, in 1973, less than half of all stripper well production came from properties with secondary recovery projects. Essley Tr. at 1144. Therefore, most stripper well operators did not even have injection wells on their properties. If Congress had intended to benefit this specialized type of production it would have said so. It certainly cannot be presumed that it intended such a benefit."

The Court believes that this argument grossly distorts both the facts and the Congressional History of the Stripper Well Exemption. As noted earlier, at the time of the enactment of the measure by the Senate there was direct reference on the senate floor to the fact that the biggest percentage of production from stripper wells is secondary or tertiary recovery. See Remarks of Senators Cook and Bartlett quoted at pages 35 and 36. Moreover, the defendant's own expert testified that forty or forty-five percent of the stripper well properties were being waterflooded. It is totally inconceivable that Congress intended to exclude nearly half of the properties subject to the exemption. Indeed, it is probable that the defendant's expert was incorrect in his assessment of the number of wells engaged in secondary recovery operations. In 1973, over forty-five percent of the production from stripper wells was produced by enhanced recovery methods, according to statistical material from the Interstate Oil Compact Commission. See P.X. 157. Depending upon how this statistic was computed, it could well be that well over fifty percent of the stripper wells were producing oil as a result of a waterflood or fluid injection operation.

Likewise, in view of the undisputed engineering testimony in this case that ordinarily production costs on a primary producing well, i. e., those costs attributable to lifting the oil through the well bore are constant whether volume of production is 100 barrels or 5 barrels a day, it is much more likely that the senatorial remarks about increased expense of stripper production referred to the expert testimony concerning the considerable extra capital outlay necessary to install a fluid injection system for secondary or tertiary recovery.

■ In light of these undeniable facts, the defendant's contention that the stripper well exemption was intended to apply only to "wells in the primary production phase" is ludicrous. Thus, mere reliance on what the agency perceived to be the traditional scope of the term "stripper well" is, at best, a poor indicator of Congressional intent. The defendant aptly notes: "The legal question is not what the terms mean in the trade, but what Congress intended when it used those terms." *Mobil Oil Corp. v. F.E.A.*, 566 F.2d 87, 92 (Em.App.1977).

■ Moreover, the Department's contention about the industry's understanding of the meaning of "stripper well" cannot stand in light of the evidence. The engineering experts on each side differed over whether an injection well has always been included in the industry usage of the phrase "stripper well." Compare, Whiting, T. 210–12, with Burt, T. 1047. The Court believes that the clearest indication of prior usage of the term "stripper well" can be found in the prior practices of the Department of Interior. As noted earlier, the DOI long included injection wells in the concept of stripper wells. This undeniable fact renders unpersuasive any argument that the industry does not include injection wells within the concept of stripper wells. Also, the unanimity and credibility of plaintiffs' expert oil engineers negates the Department's contention.

Contrary to the assertion of defendant's counsel that the only purpose of the exemption was the narrow one of exempting only recovery wells, the agency has always recognized that there were other purposes underlying the exemption. Ruling 1974–28 spoke of the purposes of the stripper well exemption:

"The purpose of the Congress, in extending exempt status for the first sale of 'stripper well' production in the Emergency Petroleum Allocation Act of 1973 (Pub.L. 93–159) (EPAA), was to assure economic viability and continued production of crude oil from marginal oil wells. The legislative history of this exemption reveals that Congress understood the 'stripper well' concept in the same way that the oil industry applies the phrase, namely with reference to oil wells with such low production levels of crude oil that the producer received only a marginal return over cost of production."

Ruling 1975–12 also recognized a more fundamental purpose of the exemption when that ruling spoke of "the congressional policy of increasing the incentive and economic feasibility of maintaining production of crude oil from stripper well leases through advanced production techniques."

 The defense counsel's argument about the intent of Congress seems to be based on the premise that the exemption was an arbitrary decision to grant relief to a narrow class of oil well owners which did not include owners of some properties with injection wells. The Court cannot agree with this basic approach. The Court believes that there were discernible reasons for the granting of the exemption. The defendant's approach begs the question of why Congress desired to grant an exemption to keep marginal wells operating. The purpose of the exemption as indicated by its legislative history, and even recognized by the DOE, was clearly to conserve oil resources and to encourage greater exploitation of marginal properties. The exemption must be construed in light of this purpose.

There are other indications of what Congress may have intended with respect to the counting of injection wells. "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived." *United States v. Fisher*, 2 Cranch 358, 386, 2 L.Ed. 304 (1805). The Court must consider these indications.

At several points in the Senate debate over the stripper well exemption, Senator Bartlett referred to the World War II subsidy program. 119 Cong.Rec. 23875. During the trial plaintiffs demonstrated that in Texas injection wells were counted to determine whether a property qualified for the subsidy. Any inference that this fact creates is weakened by the testimony that the Washington administrators of the subsidy may not have been specifically told that injection wells were being included in the well count. (Baumel, T. 678–79.) The evidence which showed that injection wells were counted to determine qualification for the subsidy, however, was the only indication of how those wells were treated in the subsidy program. This program was cited as a precedent by the exemption's sponsor. Congress may have intended to require that treatment of injection wells under TAPAA and EPAA exemptions be similar to the treatment accorded injection wells in the World War II program. The only evidence this Court has of how injection wells were treated under the prior program is the showing by plaintiffs that the injection wells in Texas were counted. This Court must conclude that this evidence provides a very limited amount of support for the plaintiffs' proposition that Congress intended to count injection wells.

This Court also believes that it is very probable that the legislators who sponsored and supported this exemption were familiar with the state practices and the treatment accorded injection wells by various states. The plain language of the exemption bears out this belief. Section (b) of the TAPAA exemption provided:

"To qualify for the exemption under this section, a lease must be operating at the maximum feasible rate of production and *in accord with recognized conservation Practices....*" (Emphasis added.)

States have for many years recognized water injection as a conservation measure

and have taken action to encourage this procedure. The high probability is that the senators may very well have been aware of the practice of the states in counting injection wells as producing wells for various purposes, and may have intended a like treatment.

 Use of the generic term "well" also indicates no intent to strictly limit the type of wells which could be counted. Indeed, the much more restrictive phrase "oil and gas wells," used in the IRS Code has been held to include injection wells. It runs counter to common sense to believe that a broader general term should read more restrictively than a narrow expression.

This Court believes that the most compelling evidence of what Congress intended by the stripper well exemption can be found in the DOI's interpretation of the stripper well exemption contained in the Mineral Land Leasing Act of 1920. The stripper well exemption contained in the 1935 amendments to that act exempted oil from the usual royalty rates, "Whenever the average daily production of the oil wells ... shall not exceed ten barrels per well...." This language is not significantly different than the TAPAA and EPAA exemptions which speak of leases whose "average daily production ... does not exceed ten barrels per well...."

Since the 1930's, the Department of the Interior has had in effect a regulation implementing this statutory exemption. As discussed earlier, this regulation identifies an active injection well as a commercially productive well, and specifies that injection wells should be counted. The underlying statute has been reenacted with this interpretation in force, and no effort has been undertaken to overturn this interpretation. In light of the consistent application of the DOI interpretation, and in light of the reenactment of the underlying statute, this Court must conclude that the DOI's interpretation and manner of treating injection wells was the one Congress intended. N.L. R.B. v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); N.L.R.B. v. Boeing Company, 412 U.S. 67, 74–5, 93 S.Ct. 1952, 1957, 36 L.Ed.2d 752 (1973).

 When Congress utilized language in a statute strikingly similar to language in an earlier statute, which language had been consistently interpreted, absent some strong indication to the contrary, Congress intended that the interpretation of the new statute be similar to that given the earlier statute. As heretofore noted, the purposes of the two statutes were similar. This Court can only conclude that the intent of Congress in using the phrase "average daily production ... per well" was to include injection wells in the well count.

 The defendant seems to think that the IRS and DOI regulations and statutes can be dismissed out of hand. The defendant ignores the long-standing practice of construing language in haec verba in similar ways. See, e. g., Oscar Mayer & Co. v. Evans, 441 U.S. 750, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979); Northcross v. Board of Education of Memphis City Schools, 412 U.S. 427, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973). ("The similarity of language in [the two provisions] is, of course, a strong indication that the two statutes should be interpreted pari passu.") As stated in Northcross, this indication is even stronger when the statutes share a common raison d'etre.

Sutherland, in his treatise on statutory construction recognized the principle:

"On the basis of analogy the interpretation of a doubtful statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships. By referring to other similar legislation, a court is able to learn the purpose and course of legislation in general, and by transposing the clear intent expressed in one or several statutes to a similar statute of doubtful meaning, the court not only is able to give effect to the probable intent of the legislature, but also to establish a more uniform and harmonious system of law." (§ 53.03.)

An example of this process which the treatise cites is Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656 (1943). Overstreet involved the meaning to be given the phrase "engaged in

commerce," which was used in the Fair Labor Standards Act. The Court held that the test to be applied was that test utilized under the Federal Employers' Liability Act. The Court recognized that the two statutory provisions were "not strictly analogous, but they are similar," and noted that they were aimed at the same problem. 318 U.S. at 131–32, 63 S.Ct. at 498.

Sutherland also points out the value of this approach:

"Harmony and consistency are positive values in a legal system by reason of serving the interests of impartiality and minimizing arbitrariness. The practice of construing statutes by reference to other statutes is based upon the sound public policy of advancing those values." (§ 50.-01.)

The desirability of harmony and consistency of law is easily seen in the present case. Certain properties subject to both the DOI stripper well regulations and the DOE stripper well regulations, are involved in this litigation. The disparate treatment accorded injection wells by these cabinet level departments has prompted one producer to ask: "How can one department of the Executive Branch (Department of Interior) lawfully count injection wells while two other departments (DOE and Department of Justice) are . . . defending in the courts the federal regulations which make the counting of injection wells illegal?" Exhibit to plaintiffs' trial brief 53. As stated in our original opinion, such a situation in a democratic government poses a legal monstrosity or contradiction that undermines the necessary citizen confidence in the fairness and/or justice inherent in our governmental system. Consistency is a jewel to which government should adhere. See 447 F.Supp. at 1149–50.

The definitive test for the proper interpretation of any statutory provision is whether a given interpretation will fulfill the congressional goals and purposes of the statute. There are no principled reasons for the proposition that including recovery wells in a secondary recovery project while excluding injection wells will serve any purpose of the statute. The contribution made by these two types of wells to the process of production are similar. But for injection wells, large amounts of oil would never be produced. The costs of drilling or maintaining injection wells are as large or larger than comparable costs on a recovery well. Because of natural forces, a provision allowing the counting of injection wells has no greater potential for abuse than a provision excluding the counting of injection wells. Likewise, as noted, state oil regulatory practices are designed to prevent industry abuse. The statutory goals of preventing shutdown of marginally productive properties, of producing domestic oil that would otherwise be purchased from foreign sources, and of flushing more oil out of the oil reservoirs, are all served by allowing injection wells to be included in the well count.

The record contains some indication that the exclusion of injection wells was the result of the agency's desire to defeat the congressional decisions embodied in the stripper well exemption statute. The agency was opposed to the exemption from its inception:

"The proposed exemption was clearly inflationary and not likely to increase oil availability significantly over the short to medium term. On October 20, 1973, Dr. Dunlop announced strong opposition to the measure. He stated: 'The Council is strongly opposed to price increases of this magnitude. We are committed to stabilizing petroleum prices while encouraging the production of all available crude oil. This amendment, if enacted, would produce unacceptable rates of price increases. This amendment is particularly undesirable since it would produce no added supplies—only higher prices.

'In fact, the language of the amendment would encourage gerrymandering of leases to take advantage of the exemption and encourage reduced levels of production from larger wells. This amendment could take billions of dollars from the pocketbooks of all Americans.'

"Despite the Council's objections and the obvious inflationary aspects of this bill, the Conference Committee reported the

bill on October 23, 1973. The Conference Committee did, however, alter the bill to include only wells producing 10 barrels or less per day."

Historical Working Papers on the Economic Stabilization Program, August 15, 1971, to April 30, 1974, p. 1308 (G.X. U–1).

At the time of the passage of the Act, the Congress rejected the agency's "cost benefit" analysis, and defined national policy to require that properties with wells which produced less than 10 barrels per day be exempt from price controls. The testimony of Phillip Essley shows that the agency was unreceptive to this congressional mandate. This Court believes that the entire testimony of Essley is merely post-hoc rationalization that cannot form a proper basis for upholding the agency.[8] His testimony did represent the agency's apparent unwillingness to be bound by what they perceived to be an unwise statute. Essley testified about this issue as follows:

"[W]e are only talking in this case about that increment in which per well, per producing well, is above ten barrels per day, and probably less than 20—somewhere between 16 and 20—that were we to adopt this particular suggested amendment, or change, would qualify the leases for stripper well production that were not previously qualified. Now, most of those leases, most of those leases, most wells, are going to be above the economic limit of ten barrels a day.

Q. What data do you base that on—
A. I base that on long experience in the industry, and knowledge of cost of production, what my own company production has been, and from experience in the stripper well area of Kansas, where I knew what the cost in that area was. I base it upon a very, very large experience. I also base it on the fact that I called an individual on several times, and we were discussing whether or not wells were being abandoned and was assured that just no wells about ten barrels per day were being abandoned, or if they were there were very, very few. They just did not know of any. So, we are talking about here most production in this category would probably still be above the economic limit."

(Essley, T. 1236–37.)

Clearly, the agency was substituting its own views as to the proper level of economic limits. Congress had determined through the statute that additional production incentive was required when one well could produce only ten barrels of oil per day. It makes no sense for the agency to state that no additional incentive was required if two wells (one of which is an injection well) can produce twenty barrels of oil per day, where the costs of production are twice the costs of a single well. Clearly, the agency has substituted its judgment for the legislative determination of Congress, and returned to its original position that the exemption was not needed. Each argument which Essley made in opposition to including injection wells was equally applicable to recovery wells, and was implicitly rejected by Congress when Congress enacted the statute.

This Court therefore holds that the agency's decision to exclude injection wells from the well count for the purposes of determining average daily production was beyond the authority of the agency, and was contrary to the intent of Congress. The intent of Congress, as seen in the purpose and history of the measure, as well as the intent inferred through the application of appropriate canons of construction all indicate that injection wells should be counted. These considerations outweigh any deference due the agency's interpretation.

8. Were this Court to consider Mr. Essley's cost benefit analysis as a basis for the final agency decision, the Court would consider evidence such as that offered by Union Oil of California to disprove the conclusion.
Some of Mr. Essley's testimony was also simply wrong. He demonstrated an incorrect understanding of the system of allowables in Texas (T. 1145, 1179–80), and of the meaning of the DOI regulation (T. 1179). The Court is also truly appalled at the method Essley used to develop his cost benefit basis for his recommendation that injection wells should not be included. The eagerness with which Essley rejected learned studies in favor of his own speculations makes one appreciate the fact that administrative decisions are subject to review.

Furthermore, as is explained and held in the following part of this opinion, the agency's action was arbitrary and capricious so as to completely obliterate any legal doctrine of deference.

## IV. THE DOE'S DECISION TO EXCLUDE INJECTION WELLS WAS ARBITRARY, CAPRICIOUS AND A GROSS ABUSE OF DISCRETION

Were this Court to assume that the agency's exclusion of injection wells could be reconciled with the statutory exemption, the agency's regulation excluding the counting of injection wells still could not stand.

The standard of review to be applied to the regulation at issue in this case is clear. TECA, in *Duncan v. Theis*, 613 F.2d 305, 309 (Em.App.1979), recognized that there existed unresolved issues as to whether the regulation in question was "arbitrary, capricious or unreasonable in the light of, or is in conflict with, or is beyond the authority granted by controlling statutory provisions...." This standard stems from *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and its progeny.

In *Overton Park*, the Supreme Court was faced with a challenge to a decision of the Secretary of Transportation. The Secretary was restricted under a statute to allow federal funds to finance construction of highways through public parks only if no "feasible and prudent" alternative existed. The Secretary in *Overton Park* had made an informal determination that no feasible and prudent alternative existed to building a highway through Overton Park and a public interest group challenged the action. The Supreme Court stated that, prior to upholding the agency's action, the Court must find that the actual choice made by the Secretary was not "arbi-

trary, capricious, an abuse of discretion, or otherwise not in accordance with law."

"To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."

401 U.S. at 416, 91 S.Ct. at 823–24.[9]

The *Overton Park* statement of the arbitrary and capricious test has consistently been applied by TECA. *Texaco, Inc. v. F.E.A.*, 531 F.2d 1071, 1076–77 (Em.App. 1976); *Grigsby v. D.O.E.*, 585 F.2d 1069, 1074 (Em.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979); and *Mobil Oil Corporation v. D.O.E.*, 610 F.2d 796, 801 (Em.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). In *McCulloch Gas Processing Corporation v. D.O.E.*, 650 F.2d 1216 (Em.App. 1981), TECA specifically restated the test:

"In summarizing the appropriate scope of review under the arbitrary and capricious standard the Supreme Court in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), held that a reviewing court must determine whether the decision of the agency was based on a consideration of the relevant factors, whether there was a clear error of judgment, and whether the agency has articulated a rational connection between the facts found and the choice made. The Court noted that under the arbitrary and capricious standard the scope of review is a narrow one, and while the reviewing court 'may not supply a reasoned basis for the agency's ac-

---

**9.** The Court is troubled by this formulation of the standard of review. The phrase "clear error of judgment" smacks of the "clearly erroneous" standard. It is clear, however, that these two standards are not the same. See generally, K. Davis, Administrative Law Treatise, § 29.- 01–2, 1980 Supp. This Court agrees with the approach taken by the Court in *Ethyl Corp. v. E.P.A.*, 541 F.2d 1, 34 n. 74 (D.C.Cir.1976), and

believes that this formulation of the standard is best read as no more than an affirmation of the traditional standard of review. Accordingly, in the context of "arbitrary and capricious" review, we shall reverse for a "clear error of judgment" only if the error is so clear as to deprive the agency's decision of a rational basis.

tion,' it should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' "
(At 1221.)

The defendant contends that it is inappropriate to apply the "relevant factors" test to this case. The defendant contends that this test is applicable only where there are statutorily prescribed factors to consider. In support of this position, the defendant cites *Kollett v. Harris*, 619 F.2d 134 (1st Cir. 1980); *Commodity Futures Trading Commission v. Hunt*, 591 F.2d 1211 (7th Cir. 1979); and *Environmental Protection Agency v. National Crushed Stone Association*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). These authorities themselves refute this argument.

In *Kollett*, the Court did not read the relevant factor test to direct:

"a court to set aside duly promulgated regulations, and order a new rulemaking, every time the administrative record does not affirmatively show whether the agency specifically addressed some particular factor which a court later feels is not irrelevant.... Since, under 5 U.S.C. § 553(c), an agency is required only '[t]o incorporate in the rules adopted a concise general statement of their basis and purpose,' not to enumerate every conceivable factor that entered the decision-making process, it is not always possible for a court to determine what consideration a particular factor received. As a leading commentator suggests, if the administrative record indicates the agency considered at least the major factors, failure specifically to address less salient points would seem an insufficient reason to set aside the rules. Davis, Administrative Law of the Seventies 666 (1976). We are satisfied from the administrative record before us that the Secretary gave sufficient attention to a *wide range of issues including the general type of matters mentioned by the district court so that the regulations promulgated cannot be invalidated for failure to consider relevant factors.*"
(Emphasis added.)

619 F.2d at 140–141. A close reading of the opinion shows that the district court had considered such factors as "regional variations in the cost of living." 619 F.2d at 142. These factors are not statutorily prescribed factors.

In *Commodity Futures Trading Com'n. v. Hunt*, supra, the Court noted that there was no indication that the agency "ignored any particular set of 'relevant factors' in reaching its determination. 591 F.2d 1211, 1217.

In *Environmental Protection Agency v. National Crushed Stone Association*, supra, the Court invalidated a Circuit Court determination that imposed the requirement that an agency take into account certain statutory factors. The Supreme Court held as a matter of statutory construction that these certain factors were not required to be considered. The Court noted, however, that the decision of the Court of Appeals would have been "logical" if the factors listed bore a substantial relationship to the considerations underlying the statutory requirement. 101 S.Ct. at 302.

Indeed, TECA has repeatedly rejected the test defendant now urges on this Court:

"The standard of review of agency action alleged to be arbitrary and capricious is not simply whether there exists a rational basis for the action. Rather, as noted in *Texaco, Inc. v. FEA* [531 F.2d 1071 (TECA 1976), cert. denied, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976)], the inquiry is 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for conclusions approved by the administrative body.' 531 F.2d at 1076–77. The enumeration by the *Texaco* court of the three elements in the conjunctive negates any implication that the rational basis test alone can suffice."
*Mobil Oil Corporation v. D. O. E.*, 610 F.2d 796, 801 (Em.App.1979).

■ The defendants, in criticizing the relevant factors test, demonstrate a basic misconception of the Court's role in scrutinizing agency decisions in general and informal rulemaking proceedings in particular.

The Court's role in such a proceeding was given careful and scholarly treatment in *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 33–37 (D.C.Cir.1976). This en banc opinion authored by Judge Skelly Wright masterfully sets forth the requirements that the Court carefully scrutinize the record:

> "A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent."

541 F.2d at 35–36, quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 850 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971). The Court's role is not to substitute its judgment for that of the agency, 541 F.2d at 34, and affirmance is required if a rational basis exists for the agency's decision. Id. "This is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time consuming) ritual." Id.

■■■ The function of the rational basis test is to reconcile these possibly conflicting roles:

> "The close scrutiny of the evidence is intended to educate the court. It must understand enough about the problem confronting the agency to comprehend the meaning of the evidence relied upon and the evidence discarded; the questions addressed by the agency and those bypassed; the choices open to the agency and those made.... The enforced education into the intricacies of the problem before the agency is not designed to enable the court to become a superagency that can supplant the agency's expert decision-maker. To the contrary, the court must give due deference to the agency's ability to rely on its own developed expertise.... The immersion in the evidence is designed *solely* to enable

the court to determine whether the agency decision was rational and based on consideration of the relevant factors." 541 F.2d at 36 (emphasis in original). The relevant factors test thus stems from the recognition that judges are not experts in an area, so they cannot determine if a decision is "wrong" in some absolute sense. The relevant factor test simply requires that the Court determine the underlying issues or factors the agency must consider in order to reach a rational result. To avoid the classification of "arbitrary," the decision must be made on a consideration of the underlying issues. The reasoning the agency used in reaching its conclusion is only important to ascertain that the holding is a rational resolution of the problem. *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972).

An example of the application of this test by a reviewing court is the recent TECA decision in *McCulloch Gas Processing Corp. v. D. O. E.*, supra. In *McCulloch*, the Court was faced with a challenge to a regulation which had been formulated through the notice and comment provisions of 5 U.S.C. § 553. The Court in that case had available for consideration a lengthy explanation of the reasons that the DOE adopted this regulation, and TECA engaged in a rather close scrutiny of these reasons. For example, one of the provisions attacked by the plaintiff was a restriction which allowed interest cost passthrough only when interest payments were made to an "unrelated entity." Of this provision TECA said:

> "The DOE did not explain, either in the notice of proposed rulemaking or in the preamble to the final rules, why the passthrough of interest payments should be limited to an 'unrelated entity.' We may properly inquire into whether there was a contemporaneous explanation of the agency decision to preclude passthrough of interest on loans from related corporations. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, supra, 435 U.S. [519] at 549, 98 S.Ct. [1197] at 1214 [55 L.Ed.2d 460]; *Bowman*, supra. *The DOE did not even*

*discuss the relevant factors considered in imposing the restriction.* The DOE's failure warrants the district court's finding that the restriction on passthrough of interest to unrelated entities only is arbitrary and capricious." (Emphasis added.) At 1225. The Court then went on to reject rationales urged by the DOE, holding that there was no articulated bases for agency assumptions, that the conclusion was based on "sheer speculation," and that the rationales were not persuasive. Id. A simple reading of this opinion makes it certain that TECA was not restricting the "relevant factors" to those found in the statutory list, but was adopting the approach set out by the court in *Ethyl*, identifying those factors which were relevant to a reasoned decision of the issue, and then looking at whether those factors were considered by the agency in reaching their conclusion.

Another example of the process applied to review of an informal rule is found in *Almay, Inc. v. Califano*, 569 F.2d 674 (D.C. Cir.1977). At issue in that case was the validity of a regulation governing hypoallergenic cosmetics. The F.D.A. had engaged in notice and comment rule-making and defined hypoallergenic as "less likely to cause adverse reactions than [10 percent of the market of] similar-use competitive products in the same category." The court applied the "arbitrary or capricious" test to the regulation. In doing so, the court rejected a test urged by the F.D.A.:

"FDA would have us believe that informal rulemaking means that 'the record of the proceeding is not required to contain "evidence" to support the ultimate determination made,' and that in promulgating a regulation by informal rulemaking, an agency may rely on its own experience and expertise, so long as those factors

appear in the record and the resulting decision is rational, arguing in effect for a type of 'super-presumption of correctness standard.' " 569 F.2d at 680. This standard, the court felt, would tend to render the appellate process a superfluous ritual. Id. at n.4. The court went on to hold that the "arbitrary and capricious" standard "cannot mean that *nothing* of an evidentiary nature is needed in the administrative record to support an agency decision." 569 F.2d at 681. After careful scrutiny of the record, the court concluded:

"The only bases in the administrative record for the Commissioner's definition are conclusions drawn from a dictionary that does not employ the chosen definition, an AMA report recommending against any use of 'hypoallergenic,' and an FTC survey, the unreliability of which is apparent on its face and indicated by its sponsor. "Under such circumstances we are compelled to find that the action of the Commissioner was arbitrary and capricious." 569 F.2d at 682–83.

■■■ On the basis of these cases, this Court must conclude that the "relevant factor" test is an integral part of the "arbitrary and capricious" test, and that the record of the administrative decision must affirmatively show consideration of the relevant factors underlying the regulation to sustain that regulation.[10]

■■■ Earlier, this Court determined that a facial examination of the regulation, ruling, statute and congressional history, was inadequate to determine if the agency had considered relevant factors in promulgating this regulation. This Court therefore allowed discovery into the administrative rec-

10. The Court earlier held that the regulations were procedurally valid legislative rules. 447 F.Supp. 1135, 1150. The defendant has not and cannot now argue that these regulations are merely interpretations, so as to avoid the "relevant factors" requirement. These regulations when issued contained a finding that "good cause" existed for failure to follow the usual notice and comment procedures. As the Court noted in *Mobil Oil v. D.O.E.*, 610 F.2d 796, 803 (Em.App.1979):

"If the DOE had concluded that either its statutory authority or the existing regulations were in need of clarification by way of an interpretative ruling, then it would have had no reason to incorporate a finding of good cause."
The record is clear that the defendant intended the regulation to have the force and effect of law, and therefore is subject to scrutiny under the arbitrary and capricious test.

ord on which the regulation was based. This procedure was adamantly and strenuously objected to by the defendant's counsel, but the Court held that since the agency had not articulated its findings on the record, since there was no contemporaneous explanation of the agency decision, and since there was no explanation to establish an adequate basis to support the rule, this Court was required to go behind the face of the regulation to review it. The lodestone basis for such trial court action is *Citizens to Preserve Overton Park, Inc. v. Volpe,* supra. This procedure has been approved by TECA. *McCulloch Gas Procession Corp. v. D.O.E.,* supra. The discovery material in these cases at bar was carefully screened so as to minimize the release of privileged material, and was released only after the Court found that release would not harm the administrative processes as a result of the release of the materials.

It must be remembered that the regulation contains no reasons for the inclusion of the language which has been held to exclude injection wells from the well count. The written materials which the DOE has identified as the agency record on which the regulation was based contains no references to the counting of injection wells. The only reference made in this written material to secondary recovery projects is contained in a memo dated October 19, 1973 (P.X. 56). This reference can be read either to anticipate the inclusion of injection wells in the well count, or not to. The written material before the agency contains no basis for a decision either to include or to exclude injection wells.

Depositions of the primary decision makers were permitted to be taken to attempt to determine on what rationale or evidence the agency based the decision not to include injection wells. A reading of the record makes it manifestly clear that the agency had *no basis* at all for making its determination. The agency did not consider the

impact which excluding or including injection wells would have on domestic petroleum reserves (Walker, D. 53), or on domestic oil production (Id.). The agency did not consider the role and function of injection wells in the recovery of crude oil. (Walker, D. 53–54.) The agency did not consider the extent of capital costs in secondary recovery projects. (Id.) The agency did not consider whether inclusion or exclusion created an incentive or disincentive for establishing secondary recovery projects (Walker, D. 55), or whether exclusion of injection wells would lead to premature abandonment of marginal properties. (Id.) The agency did not consider the treatment of injection wells by state agencies or by other agencies of the federal government. (Walker, D. 55–56.) In short, the agency considered no "studies, analyses, information or facts" prior to the promulgation of the regulation. (Walker, D. 56–57.)

The defendant in this trial did not seriously challenge the fact that the agency considered nothing prior to enacting the regulation. The defendant relied upon the testimony of Michael Ware, an official who acted in an administrative capacity in the Energy Division of the Cost of Living Council. This individual was, if at all, only tangentially involved in the promulgation of the regulation. He testified that the only discussion of, or reference to, the injection well issue prior to the promulgation of the regulation was contained in the October 19th memorandum. (Ware, T. 1002–3.) Ware stated that the economic environment was an important consideration of the agency in issuing this regulation, and the department was concerned about the exemption hindering its attempt to restrain inflation. (Ware, T. 943.) This goal, however, did not play any part in the decision to exclude injection wells as the agency did not consider the impact its decision would have on crude oil prices prior to issuing the regulation. (Walker, D. 54.) [11]

11. Mr. Ware also testified to an absurd understanding of the scope of the stripper exemption. He testified that the stripper exemptions were not intended to apply to secondary recovery operations. (Ware, T. 1002–03.) Such an understanding has no basis in fact in light of the basic engineering axioms, and such observations in the Senate debate as "by far the biggest percentage of production from stripper wells, 10 barrels or less, is secondary or tertiary recovery." Remarks of Senator Cook, 119 Cong.Rec. 23878 (July 14, 1973).

The possible failure of the agency to consider these factors may have been because the agency did not realize the import of the language which it had chosen. George Biondi, the person within the agency who actually drafted the regulation, disclosed the reason that the phrase "wells which produce crude petroleum" was used in the regulation:

"Q. Well, tell us then, the reason why you included the phrase, 'wells which produce crude petroleum?'

A. Yes. As I said, we saw a need to describe the item—it is not a term of art here—the items that we were addressing ourselves to. We were trying to describe the things that were exempt. So while the catch phrase that you have referred to stops with crude petroleum, we listed items that we thought were also crude petroleum and that were statutorily exempt. I think those were petroleum condensates and natural gas liquids. So that what we were trying to address in saying wells which produce petroleum, petroleum condensates and natural gas liquids were those wells that we were talking about being within the exemption.

. . . . .

Q. Was the inclusion of the phrase 'wells which produce crude petroleum condensates, et cetera,' which follows the word 'wells' intended to be descriptive?

A. Sure.

Q. Was it in any way intended to be a definition of the type of wells to which the statutory stripper exemption applied?

A. The type of wells, no.

Q. The type of wells?

A. No.

Q. All right. Was the inclusion of the language, 'wells which produce crude petroleum,' intended to exclude the counting of injection wells in the well count?

A. Not to my knowledge, no." (Biondi, D. 41–43.)

Biondi stated that the heading to Section 406 of the TAPAA contained a reference to natural gas, whereas the body of the statute referred only to crude oil. The phrase "wells which produce crude oil" was included to insure the exemption would not be claimed to cover natural gas. (Biondi, D. 39–41.) Incredulously, Biondi also testified that at the time he drafted the regulation he did not even know what an injection well was! (Biondi, D. 33.)

More support that the present interpretation of the regulation language was unintended comes from William Walker, previously quoted, who was general counsel for the Cost of Living Council at the time of the enactment of the regulation:

"A. But I do not recall that in connection with the stripper well exemption that we focused with any precision on the issue of secondary recovery.

Q. Or injection wells?

A. Or injection wells. Now, we made plain to the Congress, the administration and the internal memoranda to which you have referred our concern generally about gaming the system and what has been called gerrymandering and so on, and our desire to draw the exemption narrowly. But I am not aware of any specific discussion with respect to injection wells in the course of the development of that regulation.

Q. Let me ask you this, Mr. Walker: would your desire to narrowly construe and interpret the stripper exemption necessarily mean that you intended to exclude the counting of injection wells in determining average daily production?

. . . . .

A. We . . . I don't think we intended to include them or exclude them, Mr. Kennedy; we simply—we were not focusing on the injection well issue in the drafting of that regulation." (Walker, D. 52–53.)

Even the defendant's witness, Ware, went out of his way to agree with the foregoing statement of Walker. (Ware, T. 996.)

▆▆▆▆ Based on this undisputed record, the Court must conclude that to the extent that the regulation excludes injection wells from the well count, it was issued in a manner which was arbitrary, capricious, and a gross abuse of discretion. The record discloses that the exclusion contained in the regulation was not the result of any semblance of reasoned decision making, but rather was the result of happenstance, and an unintended construction of language contained in the regulation. The agency failed to consider any factors which could be deemed relevant. The agency failed to consider any facts. The agency did not consider whether excluding injection wells would further or hinder the congressional purposes underlying the stripper well exemption. Bluntly stated, neither ignorance of the subject matter nor vacuity of thought processes can amount to consideration as a thought process accomplishment of a government agency. The agency's process in arriving at the regulatory exclusion of injection wells must be deemed "arbitrary" under any construction of that word.[12]

▆▆▆▆ Moreover, the record fails to disclose any basis which could serve as a rational basis for differentiating between injection and recovery wells for the purpose of this exemption. Clearly, Congress intended a narrow construction of the statute, but an arbitrary construction could not have been intended. The engineering facts disclose that an injection well is physically

---

**12.** In fact, the defendant argues that no reasoned decision need be made. For support, defendant cites *Barr v. United States*, 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765 (1945):

"If Congress had made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators."

The defendant fails to realize that there are essential differences between the legislative power to make statutory laws and the administrative power to implement a statutory law with regulations. Were this Court to accept the defendant's contention, it would be forced to accept arbitrary results which arose from a fortuitous phrase contained in a regulation. It is the Court's duty to guard against arbitrary actions by agencies. To accept the defendant's theory would be to abdicate this responsibility.

TECA has determined that it is the legislative rule which excluded injection wells. *Duncan v. Theis*, 613 F.2d 305, 307–08 (Em.App.1980). This Court would not require an agency to foresee all possible implications of its regulations. Rather, this Court would only require that issues which a regulation resolves be decided on some rational basis. Issues unresolved by a regulation may later be decided by new rule making procedures, or by interpretive rules.

Were these actions the result of an interpretive ruling, this Court would be free to substitute its judgment as to the proper interpretation. Interpretive rules do not bind the Court.

"The Courts may find them persuasive and may treat them as if they were binding, but the courts have the reserve power to substitute their own judgment on all questions of statutory interpretation. The preliminary power of interpretation is in the agency, but the final power of interpretation is in the courts."

*Energy Reserves Group, Inc. v. D.O.E.*, 589 F.2d 1082, 1093 (Em.App.1978), quoting K. Davis, Administrative Law of the Seventies, § 5.03–1, l.c. 152.

Contrary to the defendant's argument, a determination that the interpretation was "reasonable" would not be made solely by reliance upon the language of the regulation. As noted earlier, reliance on the plain language of the regulation is risky, at best. See p. 1257, supra. In evaluating the reasonableness of the interpretation, the Court would have to undertake virtually the same inquiry into congressional intent and historic facts it has had to take in this case, and would conclude that the interpretation is wrong in light of the factual circumstances and the statutory language and purposes.

This Court can paraphrase a statement by TECA in an analogous case:

"In view of the circumstances already referred to it would, indeed, be a tyranny of words rather than a recognition of ideas portrayed by words to narrowly construe the definition of [average daily production per well] in the manner [DOE's] argument on 'plain meaning' would have us do."

*U.P.G., Inc. v. Edwards*, 647 F.2d 147, at 152 (1981).

To accept the defendant's theory would allow the agency to bootstrap an arbitrary decision into a regulation having the force of law, without following any procedures or considering anything.

similar in construction to a recovery well. (See Appendix "A".) The costs associated with drilling and maintaining an injection well are as great or greater than costs associated with drilling or maintaining a recovery well. The only distinctions offered by the defendant are: (1) that injection wells do not actually emit hydrocarbons, and (2) the contribution to production of an individual injection well cannot be determined with precision. These are distinctions without difference. The engineering contribution of an injection well is undisputed. The water forced into the reservoir, via the injection well, provides energy pressure, displaces crude oil, and forces oil from the reservoir into the well bore of a recovery well. The fact is that but for the injection wells, such crude oil would not have been obtained. It could not be produced under known oil production methods. Whether the oil is brought out of one well bore or a different well bore simply does not matter. The fact that the contribution of an individual injection well cannot be measured does not matter. The statute provides that the exemption is to be based on the production of the lease. Whether any one injection well contributes one barrel of oil per day or 100 barrels of oil per day matters no more than whether a given recovery well recovers one barrel of oil per day or 100 barrels of oil per day. Only the total number of wells is of importance. The problems which the Congress envisioned are equally addressed by allowing injection wells to be included in the well count as by allowing recovery wells to be so counted.[13] In fact, the DOE's position would be as defensible if it had excluded recovery wells and included only injection wells in the well count on secondary recovery projects. Excluding injection wells seems as nonsensical as would be a decision to exclude fathers from a count of parents.

The defendant should not be surprised that the Court is unable to find a meaningful distinction between injection wells and recovery wells for the purpose of this statute. Since 1940, courts have had difficulty in finding some basis for affording these wells dissimilar treatment. In *Page Oil Co. v. Commissioner of Internal Revenue Service*, 41 F.T.A. 952, 963 (1940), aff'd., 129 F.2d 748 (2nd Cir. 1942), the Court refused to allow deduction of the costs of drilling an injection well, holding:

> "that the [water injection wells] involved in this proceeding [were] sufficiently similar to oil wells to require the same tax treatment."

To reiterate, the record before the Court convinces this Court that the actions of the agency not only constitute an example of arbitrary actions, but also show a complete abdication of any semblance of reasoned decision making. The type of actions which occurred in this dispute are the type of actions which judicial review was designed to correct. Only if this Court were to disregard his duty to check arbitrary irrational actions of an agency could he allow the regulation as interpreted to stand. To sustain the defendant's position would be to ignore the facts in the record and exhaust the notion of deference to an agency decision into a belief that an agency can do no wrong, and to reduce the idea of judicial review to a mockery.[14]

13. For example, first consider the case of a lease containing two recovery wells, each producing 10 barrels of oil per day through each physical well bore. Under the DOE interpretation this lease would qualify. Next, consider the case of another lease containing two wells, one an injection well and the other a recovery well. If the production of the second lease is 20 barrels of oil per day through the one physical well bore, the property would not qualify under the DOE interpretation, even though the costs faced by the two leases are identical and each are subject to the same disincentive effects envisioned by Congress. The second lease would seem to be as economically marginal as the first lease. The Court can envision no principled reason these two leases should be treated in different manners, and the defendant has offered no reason.

14. Comment was made at the inception of this opinion about the particularly adversarial legal tactics and attitudes displayed by most of defendants' counsel throughout the course of the litigation—the impression conveyed being that no discovery or trial in this matter should be countenanced by this Court in deference to administrative expertise by the series of agencies and/or departments involved in the administration and enforcement of the series of legislative acts. As a result of the discovery permitted and the evidence introduced at the trial, the

## V. POST TRIAL MOTIONS

Also for decision are the post trial motions of the defendant to reopen the record for the inclusion of two letters as exhibits, and to allow the defendant to supplement response to certain interrogatories.

 The Court believes that the first motion to reopen the record should be granted. The letters sought to be admitted into evidence are innocuous and basically cumulative of the evidence already before the Court. The Court can foresee no prejudice befalling the plaintiffs from the inclusion of these two documents in the record. At the conclusion of the trial the Court indicated that he would accept material from either side which had not been offered due to oversight or some other valid reason. This material falls within that category, and the Court sees no reason for not making it a part of the record. This motion is therefore granted.

The motion to allow the defendant to supplement its answer to certain interrogatories after trial, however, does present a different issue. The plaintiffs properly characterize this motion as "bizarre." The reason for this unusual motion, according to the defendants, is that although the defendants do not believe they operated under any duty to supplement the interrogatories,

> "because of plaintiffs' disingenuous attempt to use some of these incomplete responses, defendants are filing amended answers in the event the Court holds supplementation necessary to prevent any prejudice to defendants from plaintiffs' purported reliance on them, and to clarify the record."

To better understand this motion, that portion of the transcript containing the "disin-genuous" use of the interrogatories is attached to this order as Appendix "B".

The Court is mystified by the arguments the defendants raise in support of this motion. The first argument is that defendants were under no duty to supplement their responses. It escapes the Court why the absence of such a duty would allow the defendants to tender the amended answers and have them accepted.

The second portion of the defendants' brief in support of this motion is a section stating how, if the Court finds that supplementation was required, the Court ought to accept the revised answers to the interrogatories. Again, however, the Court fails to see the nexus between the existence of a duty to amend interrogatories and the post trial motion of the defendants to supplement responses.

Finally, the defendants argue that "any attempt to hold defendants to what are now shown to be incomplete or misleading responses would thwart the search for truth in the fact-finding process." The Court believes that if the original responses created the great prejudice which the defendants now claim, the defendants would have acted sooner to correct the "incomplete or misleading responses." The defendants should not now complain that their earlier failure justifies such an extraordinary measure.

 This Court has been unable to find precedent for this motion, and is confident that none exists. The Court, therefore, is at a loss as to the proper approach to take to this motion. Were this Court to consider the present motion as a motion to reopen the record to include more evidence, the motion would be denied. When offered

motivation or reason for the actions of the government's counsel seems quite apparent, i. e., the necessity of maintaining a veil of secrecy about the administrative action taken relative to implementation of the so-called stripper well exemption. As indicated in prior orders in this case, this Court is well aware of the facts and basis of asserting governmental privilege or immunity to probe debate on governmental policy in an agency. However, as here, where congressional intent was misread or half-read as to pursuing blind enforcement aims over conservation aims to satisfy agency views rath-er than congressional intent, governmental privilege or immunity cannot be a shield to disclosure. Nor, as here, where pretrial discovery denotes ignorance of facts upon which agency action should be based, can such ignorance by governmental personnel of the subject matter which they are regulating be a deterence to judicial fact finding or a barrier to justify nondisclosure on immunity grounds. Ignorance should never be a shield for governmental executives or employees in a democratic form of government.

on behalf of the responding party, answers to interrogatories are generally inadmissible hearsay evidence. The supplemental answers are no exception.

Were this Court to consider the motion as one to supplement answers to interrogatories, the motion would be denied. Supplementation of answers is required to be made at an appropriate time. Four weeks after trial under any circumstances is not the appropriate time. See, *Matlack, Inc. v. Hupp Corp.*, 57 F.R.D. 151 (E.D.Pa.1972).

 The Court cannot understand why the defendants are bothering to assert this motion. Clearly, the defendants were not bound by the answers to the interrogatories, and were allowed to present evidence which was contrary to those answers at trial. The answers to interrogatories which were admitted by the Court constitute evidence which must be weighed by the Court. See, Wright & Miller, Fed.Prac. & Proc. § 2181. The Court believes that the only purpose which would be served would be to allow the defendants to eliminate the admittedly "incomplete and misleading" answers and mitigate the sting created by plaintiffs' counsel's excellent use of these answers.

 It would be highly improper and unfair to the plaintiffs if this Court would allow the defendants to promulgate answers to interrogatories after trial, and then consider these answers without affording the plaintiffs an opportunity to respond. Allowing amendment followed by response could amount to a retrial of the entire case. The Court does not believe that such a course is at all proper.

 This motion raises the specter of an attempt to conform the evidence to reflect what was presented at trial. Any Court's job would be greatly simplified if counsel for litigants could in post trial proceedings eliminate any conflict in their evidence, and restructure the evidence so that their case is a homogenous, credible and logical whole. The usual course of proceedings, where development of the facts precede the trial, appears to be the only way that the truth-finding mission of this Court can be fulfilled. The defendants' motion to modify this traditional course of events borders on the frivolous.

The Court is cognizant that this is an M.D.L. proceeding and not all parties to the M.D.L. joined in this trial. The Court, therefore, will allow the defendants to include the supplemental responses in the discovery materials for use in subsequent cases, should it become necessary to try other cases, which appears now to be most doubtful.

## VI. CONCLUSION

 IT IS THEREFORE ORDERED AND ADJUDGED that Regulation 6 C.F.R. § 150.54(s), 38 Fed.Reg. 32484, and subsequent similar regulations, as interpreted by Ruling 1974–29 to exclude injection wells from the well count, are void and of no legal effect, and the Department of Energy is hereby enjoined from administrative use, application, implementation or enforcement of such regulation as interpreted by the Ruling, against each of the plaintiffs herein.

IT IS FURTHER ORDERED that the defendants' motion to supplement the record with two letters, is hereby granted.

IT IS FURTHER ORDERED that the defendants' motion to supplement answers to interrogatories is hereby denied, except as to M.D.L. cases which have yet to be tried, if any.

It has been the Court's firm view for some time that the importance of the issues in this case, the nature of the adversaries, and the simply tremendous sum of money dependent upon the final judgment in this M.D.L. litigation, would necessarily run the gamut of appellate processes. Upon this premise, and the premise that the fund is secure under the jurisdiction of this Court and the agreement of the parties, the Court will make no order at this time relative to distribution or disbursement of the trust fund, until the termination of this litigation.

APPENDIX "A"

PLAINTIFF'S EXHIBIT 35
PENGAD-Bayonne, N. J.

APPENDIX "B"

Q. Now, you testified yesterday, and I am sure it is the same today, that the stripper well regulation, which we have been talking about, is a joint venture between the CLC Energy Division and

the Office of General Counsel CLC, is that correct?

A. You mean the writing of the regulation?

Q. That is correct.

A. Yes.

Q. All right. Now, as I understand it, what you have testified to this morning, and early this afternoon, you are telling this Court that you participated in the development, preparation, and issuance of that regulation, is that correct?

A. Yes.

Q. You are telling the Court because of your intimate involvement with Mr. Owens that you participated in the discussions which led up to the adoption of that regulation?

A. Yes. I recall being involved in discussions and actions, coordinating actions, which involved that regulation.

Q. Are you aware, Mr. Ware, that pursuant to court order the Department of Energy was ordered to file a document with this Court, and they did so in February of 1980, swearing under pain of perjury, that there were only nine persons involved in the development, preparation, and issuance of the stripper well regulation, and you weren't one of them?

MS. CRISMAN: Objection, your Honor. This is exactly one of the interrogatories that we intend to amend. And, your Honor, for reasons that your Honor has forced us to go find people who could testify at this trial, in the last several weeks, and we did so, and Mr. Ware is one of the people that came to our attention, and we talked to Mr. Ware, and we will amend our interrogatory with the appropriate response.

MR. BECK: Your Honor, they were served with interrogatories on December 26, 1978. After this Court ordered them to do so, they filed answers on February 20, I believe, of 1980. They had a year and two months to find out who was participating in the development, and who discussed the development, and who helped write the regulation. They came up with nine people, and this man wasn't one of them.

MS. CRISMAN: Excuse me, your Honor. I would like to correct Mr. Beck's harangue. Our answers were filed in February of '79—not February of '80.

THE COURT: Well, this illustrates the problem that you have on those. And, I can see where you want to amend them. But, they had them, and they have relied on them, and up until this morning when you indicated that they were not accurate. You made a statement into the record, and that probably takes away the thrust of your question, Mr. Beck. (to Ware prior to Ms. Crisman's objection)

MR. BECK: My question:

Q. (By Mr. Beck) Were you aware of that?

A. No sir, I was not.